In the Matter of TRIBORO COACH CORPORATION et al., Respondents, against NEW YORK STATE LABOR RELATIONS BOARD et al., Appellants.

Argued June 10, 1941; decided July 29, 1941.

*John J. Bennett, Jr., Attorney-General (Henry Epstein* of counsel), *Daniel Kornblum, Eugene Cotton* and *Harold Dublirer* for appellants. Even if it be assumed that the 1936 contract was not terminated, the contract was still subject to the provisions of the State Labor Relations Act (Labor Law, Cons. Laws, ch. 31, art. 20) and did not preclude the Board from investigating the question of the representation of Triboro's employees. (*Hamilton-Brown Shoe Co.* v. *N. L. R. B.*, 104 Fed. Rep. [2d] 49; *Remington Rand, Inc.*, v. *N. L. R. B.*, 94 Fed. Rep. [2d] 862; *Metropolitan Life Ins. Co.* v. *New York State Labor Relations Board*, 280 N. Y. 194; *National Federation of Railway Workers* v. *National Mediation Board*, 110 Fed. Rep. [2d] 529; *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398.) The Board's finding that the 1936 contract had expired on October 20, 1939, is supported by substantial evidence, and the court below erred in setting aside that finding. (*Matter of Stork Restaurant, Inc.*, v. *Boland*, 282 N. Y. 256; *Metropolitan Life Ins. Co.* v. *New York State Labor Relations Board*, 280 N. Y. 194; *N. L. R. B.* v. *Waterman S. S. Co.*, 309 U. S. 206; *Sun Oil Co.* v. *Heller*, 248 N. Y. 28; *Dana* v. *Munson*, 23 N. Y. 564; *Smathers* v. *Standard Oil Co.*, 199 App. Div. 368; 233 N. Y. 617.) The 1939 closed shop contract, executed in the face of the Board's direction of election, was not made with the representative of Triboro's employees, and was consummated in deliberate derogation of the employees' right to a free choice of representatives. (*Valley Mould & Iron Corp.* v. *N. L. R. B.*, 116 Fed. Rep. [2d] 760; *N. L. R. B.* v. *Falk Corp.*, 308 U. S. 453; *Fur Workers Union Local No. 72* v. *Fur Workers Union*, 105 Fed. Rep. [2d] 1; 308 U. S. 522; *N. L. R. B.* v. *Waterman S. S. Corp.*, 309 U. S. 206; *Sharp & Dohme, Inc.*, v. *Storage Warehouse Employees Union*, 24 Fed. Supp. 701; *Lund* v. *Woodenwear Workers*, 19 Fed. Supp. 607.)

*Samuel Seabury* and *George Trosk* for Triboro Coach Corporation, respondent. The 1939 agreement is valid. (*N. L. R. B.* v. *Louisville Refining Co.*, 102 Fed. Rep. [2d]

678; *Powhatan Mining Co.* v. *Ickes*, 118 Fed. Rep. [2d] 105.) The validity of the 1939 contract is not affected by the fact that it was executed prior to an election of which the Board had previously given notice. (*Williams* v. *Quill*, 277 N. Y. 1.)

*Charlton Ogburn* for Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, respondent. The 1936 contract was automatically continued and there is no evidence to support any finding to the contrary. (*Sokoloff* v. *National City Bank*, 239 N. Y. 158; *Brown* v. *Champlin*, 66 N. Y. 214.) The contract of 1939 was executed by representatives of a union comprising a majority of the employees at the time, and is valid. (*N. L. R. B.* v. *Louisville Refining Co.*, 102 Fed. Rep. [2d] 678.)

FINCH, J. The facts in this case have been fairly and well stated in the dissenting opinion by Chief Judge LEHMAN.

The question is clear. It is our opinion that the decision found by the Labor Board puts a premium upon industrial unrest. The question presented for decision is whether employees, who have selected a labor union as their representative by joining and retaining membership therein, and who have allowed such selected representatives to make an agreement which is binding upon the employer, are in spite of this contract still entitled to a certificate from the Labor Board to the effect that they have selected another union as their bargaining representative in order to void the contract which they have previously made. In short, the question is whether employees who have made a valid contract with their employer may, while the contract is in force, choose another union as their representative to repudiate the contract which is already in force.

The validity and the fairness of the contract entered into by the Triboro Coach Corporation and Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Local Division 1104, in 1936 is not questioned in this proceeding. Thus the Board by its own

act of reversing its order for an election upon the first application by the Transport Workers Union has recognized the validity of that contract for the three-year period of its existence. It is this 1936 agreement which the Board has found Amalgamated elected to terminate at the expiration of the then current term. Both the Special Term and the Appellate Division have held that that finding is not supported by any substantial evidence. Only by reading into the letter sent by Amalgamated to Triboro on July 17, 1939, an intention which is admittedly not expressed in that letter, and by withdrawing isolated statements of the witnesses from the context of the entire testimony of such witnesses, can evidence be found which supports this finding by the Board. Thus it cannot be said upon this record that Amalgamated ever expressed its intention to terminate the contract of 1936. It follows that the 1936 contract was automatically renewed under its terms by the inaction of the parties when the first three-year period expired on October 20, 1936.

Since this 1936 contract provided for a closed shop and under its terms every employee of Triboro was a member of Local 1104 (Amalgamated), it follows that at the time of the making of the November 14, 1939, agreement, the officers of Amalgamated were the " representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes  *  *  *." (Labor Law, § 705.) Since the contract of November 14, 1939, was a contract made by the employer with a labor organization which is " the representative of employees as provided in section seven hundred five " (§ 704), it follows that this contract, which was ratified in a properly noticed meeting held by Amalgamated, by the vote of 128 employees (which constituted a majority of the 240 Triboro employees who were affected thereby) is a valid and binding contract. Since the enactment of the State Labor Relations Act (Labor Law, art. 20; Cons. Laws, ch. 31), the right of the employer to contract with the representative selected by the employees is not in doubt (§ 705, subd. 5). In order for such contracts to be of any effect to carry out the policy of the act to establish

industrial peace (§ 700), such contracts must be binding on both parties.

In any event, if the 1939 agreement was not valid, the 1936 agreement would still continue in effect, since no notice of an intention to repudiate that contract was sent by either party to the other ninety days before the termination of the contract as provided therein.

It is urged that, since the Board had determined that a controversy existed among the employees as to the appropriate representative to bargain with the employer and had issued an order for an election to determine such controversy prior to the time of the making of the 1939 agreement, Triboro's knowledge of such action by the Board suspends the right of the employer to enter into a contract with the selected representatives of a majority of the employees. The act does not so provide, and the only argument that is advanced to sustain this contention is that to hold to the contrary deprives the employees of their right under the statute to choose their own representatives. If the right of the employees to choose their own representatives was actually barred by this action by the employer, then a serious question would arise as to whether or not the action of the employer in the case at bar was not illegal and contrary to the Act. However, such is not the situation in the case at bar.

It will be noticed that in this case the Transport Workers Union did not petition for an election to determine an appropriate agent until July 20, 1939. This was the same day that the period expired during which Triboro could have notified Amalgamated that it elected to terminate the 1936 agreement. Thus after the expiration of the period during which notice to terminate the 1936 contract might be given, Triboro was bound by the closed shop provisions of that contract and was bound to negotiate with Amalgamated exclusively as to all conditions of employment which were covered by it. By waiting until the expiration of the period during which such notice might be given, the employees have in effect made a choice that Amalgamated

is to be their representative for the next three years or until another representative is chosen, since they have not notified their employer or the Labor Board of a contrary intention.

Thus it is claimed that Transport which, if designated the appropriate bargaining agent before the 1936 contract was renewed, might have repudiated that contract by delaying its petition for a representation proceeding until after the expiration of the period in which notice might have been given, has now placed Triboro in a position where it cannot deal validly with any labor union, since to deal with Amalgamated violates the designation of the Board and to deal with Transport violates the 1936 contract with Amalgamated. It is submitted that Triboro has been placed in no such distorted position.

The first representation hearing in 1937, brought by Transport, which was dismissed without prejudice to Transport to renew its petition within any reasonable period prior to the expiration of the 1936 contract, would not compel Triboro to give notice to Amalgamated that it elected to terminate such contract, since its employees had taken no further action in accordance with the permission granted by the Board. There could be no duty on Triboro to anticipate that such further action would in fact be taken.

As was pointed out in the opinion at Special Term, there were several courses of action open to the employees of Triboro to prevent the renewal of the 1936 contract and the subsequent execution of the 1939 contract. Thus the employees, as members of Amalgamated, might by resolution have directed the officers of Amalgamated to give notice of termination of the 1936 agreement before July 20, 1939, or the employees might have given such notice directly (§ 705, subd. 1). Or the same result might have been accomplished by instituting a representation proceeding before the expiration of the period ninety days before the end of the contract. However, by failing to take any of these courses of action, the employees have made their

choice that Amalgamated is to be their representative for the next three years or until the contract expires and other representatives are chosen.

On the other hand, Triboro which, according to the provisions of its franchise, would lose its franchise to operate buses if it did not have a collective bargaining agreement with a *bona fide* labor organization at all times, having had no further indication from its employees, had no alternative but to allow its contract with Amalgamated to be automatically renewed.

It is also urged that these employees were not offered the choice of accepting the new contract made with Amalgamated or of insisting upon their right to choose a different union as their representative in the vote on the 1939 agreement. That choice had already been made by the employees when they failed to take any action to terminate the 1936 contract. Instead of rejecting such new contract, which they had the power to do, the majority of the employees of Triboro voted to approve such new contract, thus adopting and approving of the actions of their adopted representatives.

The decision of the courts below does not deprive the Transport Workers Union, or any other union, of the right to organize the employees of Triboro. (*Stillwell Theatre, Inc.,* v. *Kaplan,* 259 N. Y. 405.) Such organization may be attempted at any time, and the Board may certify the new union as the appropriate bargaining unit for the purpose of entering into further contracts with the employer upon the expiration of the existing contract. However, there is nothing in this right of union members to select a new bargaining representative which would impair the sanctity of the obligations of the existing contract while that contract was still in force.

It will be noticed that the refusal of this court to grant to the Board the power which it claims to set aside contracts where it finds that the employees have chosen a new bargaining unit, would tend to compel the new union to resort to a strike to enforce its demands. Chief Judge LEHMAN

in his opinion approves of the method of avoiding industrial strife chosen by the Board. However, the effect upon the employer between these two methods of settling such a dispute should be considered. Under the first method, according to the settled practice of the Board, the contract is subject to be revised once each year. The employer has no recourse but to enter into new negotiations with the newly-designated representative. However, if the union resorts to a strike, the employer will be free to discharge those workers who are unwilling to be bound by the contracts which they have made through their selected representatives.

The practical implication of the decision of the Board upon the closed shop unions was clearly pointed out by the testimony of George Meany, president of the New York State Federation of Labor and now the General Secretary of the American Federation of Labor. Mr. Meany testified that the Board's decision that it will hold an election upon request when it finds that the workers desire a change of bargaining agent, will upset the entire democratic process whereby closed shop unions are controlled, since that decision will allow workers to set up their own rival unions instead of seeking control by the normal process of joining the union in power and electing representatives favorable to their views. In this way, the Board, instead of furthering industrial peace, makes itself an instrument to destroy a collective bargaining organization and to weaken the effectiveness of collective bargaining.

The decisions of the Special Term and the Appellate Division are in keeping with the policy of the act as set forth in section 700. Thus where the bargaining power between employers and employees has been equalized through the powers of the Board, the recognition of the sanctity of contracts made between the parties would seem more likely to remove sources of industrial strife and unrest. Industrial peace is promoted by collective agreements obtained for employees through the medium of their

*bona fide* labor organizations or other proper representatives. When such an agreement has been obtained, and a stable relationship established thereby, the very purpose of the act may be defeated if the machinery of the Board be employed to upset such contractual relationship.

It follows that the order appealed from should be affirmed, with costs.

LEHMAN, Ch. J. (dissenting). In anticipation of the grant of a franchise by the city of New York for the operation of a public omnibus line, Triboro Coach Corporation, hereinafter referred to as Triboro, made a " collective agreement " dated January 9, 1936, with Local No. 1104, Amalgamated Association of Street, Electric Railway and Motor Coach Employees (affiliated with American Federation of Labor), hereinafter referred to as Amalgamated. The contract fixed wages, hours and other conditions of employment and by its terms Triboro agreed to employ as operators and garagemen on the routes which it might thereafter operate, only members of Amalgamated. Since, at the time the contract was made, the company was not operating any omnibus line and had not yet received any franchise, the contract was made subject to the condition that a franchise should be granted thereafter by the city of New York and it was expressly provided therein that the " contract shall not be operative or binding until the granting and signing of the aforesaid contract or franchise." The franchise was signed on October 20, 1936, and the contract became effective on that date. Paragraph eleven of the contract provides that " the term of this contract shall be three years, provided, however, that the said contract shall continue automatically for successive periods of three years unless either party shall notify the other party, in writing by registered mail, at least ninety days before the expiration of the then current term, that the notifying party elects to terminate the contract at the expiration of the then current term."

More than ninety days before October 20, 1939, the date of the expiration of the original term of the contract, Amalgamated began discussions or negotiations with Triboro for

change in the terms of the contract. On July 17, 1939, Amalgamated sent to the president of Triboro the following letter:

" Dear Sir: I am enclosing a copy of the new contract, which L. Wickers [president of Local 1104] has asked me to send you. Mr. C. Clark [international officer of Amalgamated] also has a copy, and who I believe will arrange a conference with all parties at Mr. Pintos' [Triboro's attorney] office.

" Very truly yours
" HARRY MELROSE
" *Financial Secretary.*"

(Parenthetical identification of the persons named in the letter is, of course, not in original letter but is supplied by the petition and brief of Triboro and the findings of the Labor Board.)

On July 20th, exactly three calendar months before the expiration of the original term of the contract, a petition was filed with the State Labor Relations Board by Transport Workers Union of America, affiliated with Committee for Industrial Organization, hereinafter referred to as Transport Workers Union, asking that the Board certify that organization as the exclusive representative of the employees of Triboro " for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment " in accordance with the provisions of section 705 of the Labor Law (Cons. Laws, ch. 31).

The Labor Board held formal hearings upon the petition and on October 30, 1939, it made and filed a decision that " a question or controversy has arisen concerning the representation of the employees of the Triboro Coach Corporation within the meaning of Section 705, subdivision 3, of the Act," and that " all the employees of the Triboro Coach Corporation, exclusive of clerical and supervisory employees, constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 705, subdivision 2 of the said Act." It then directed that " an

election by secret ballot shall be conducted within twenty (20) days from the date hereof, under the supervision of the Board or its agents, at a place and during hours to be fixed by the Board, among all the employees of the Triboro Coach Corporation (exclusive of clerical and supervisory employees) employed by the Triboro Coach Corporation on September 27, 1939, to determine whether they desire to be represented for the purposes of collective bargaining in respect to rates of pay, wages, hours or employment and other conditions of employment by the Transport Workers Union of America, C. I. O., or by Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, Local Division 1104, A. F. of L., or by neither." The date of September 27, 1939, specified in that direction, was the day upon which the hearing on the petition was held.

To allow time for preparation for the election, Amalgamated thereafter requested the Labor Board to fix the date of the election near the end of the period of twenty days from October 30th, during which the Labor Board had directed it should be held. The Board, complying with that request, ordered the election to be held on November 17th. In the interval, Amalgamated and Triboro concluded a new agreement which was ratified by a *majority of the employees of Triboro, voting as members of Amalgamated at a meeting of Local No. 1104,* on November 14th. The new agreement provided, among other things, that, " The parties hereto expressly agree that the provisions of this agreement shall *supersede* the provisions of the Memorandum of Collective Agreement entered into between the parties on or before the 9th day of January, 1936; and further agree that *upon the execution of this present agreement* the provisions of said Memorandum of Collective Agreement shall be inoperative and of no force and effect." (Italics not in contract but are in brief of Triboro.) Like the original contract the new agreement provides that Triboro will employ only members of Amalgamated. Like the original contract, also, it contains provision for successive automatic renewals unless terminated by notice. In some other

respects, the terms of the new contract are different and, we are told, are more favorable to the members of Amalgamated employed by Triboro. Because of the situation created by the ratification of the new contract at the meeting of the members of Amalgamated on November 14th, which was called after the Labor Board had, at the request of Amalgamated, set November 17th as the date of the election which it had previously ordered, the Labor Board postponed that election to November 24th. At that election a large majority of those eligible to vote because they were employees of Triboro on September 27th, chose Transport Workers Union to represent them for purposes of collective bargaining, and the Labor Board certified that union as the exclusive bargaining representative. Triboro, in reply to a request for an appointment, wrote to that union: " You will be good enough to note that we are at present under a contract with Local Division 1104 of the Amalgamated Association, which governs our relations with our employees in reference to the matters covered by it. This contract we are not at liberty to breach. If, however, there is any matter not covered by that contract as to which you desire an interview with us, we shall, of course, without prejudice to our rights, be glad to see you at such time and place as may be mutually convenient." Since the Triboro's contract with Amalgamated was intended to cover all the terms and conditions of employment by Triboro and to exclude from such employment any persons who are not members of Amalgamated, Triboro, in effect, refused to negotiate with the Transport Workers Union.

The Transport Workers Union filed charges with the Labor Board that in refusing to negotiate with it, Triboro was engaging in unfair labor practices as defined in New York State Labor Relations Act (L. 1937, ch. 443), article 20 of the Labor Law. In February, 1940, the Labor Board issued its complaint based upon these charges. Hearings were held and on July 5th, 1940, the Board rendered its decision, finding and concluding that the Triboro was guilty of unfair labor practices and ordering that Triboro:

" 1. Cease and desist from:

" (a) Giving effect to its purported agreement of November 14, 1939 with the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Local Division 1104, relating to hours, wages and working conditions, or to its agreement of January 9, 1936 with the said Amalgamated, or to any purported modification or renewal of either of said agreements;

" (b) In any manner discouraging membership in the Transport Workers Union, by discrimination in regard to hire or tenure or other terms and conditions of employment;

" (c) Requiring its employees, as a condition of employment, to be or become members of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Local Division 1104;

"(d) In any manner interfering with, restraining or coercing the employees in the exercise of their right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining and other mutual aid or protection, as guaranteed in section 703 of the New York State Labor Relations Act;

" (e) Refusing to bargain collectively with the Transport Workers Union of America as the exclusive representative of its employees, excluding clerical and supervisory employees, in respect to rates of pay, wages, hours of employment and other conditions of employment.

" 2. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

" (a) Upon request, bargain collectively with the Transport Workers Union of America as the exclusive representative of all its employees, exclusive of clerical and supervisory employees, with respect to rates of pay, wages, hours of employment and other conditions of employment;

" (b) Post immediately, in conspicuous places on its premises, where its employees customarily assemble, and maintain for a period of at least thirty consecutive days, notices

to its said employees, stating that it will comply with paragraph ' 1 ' of this Order, and will take the affirmative action described in paragraph ' 2(a)' of this Order;

" (c) Notify the New York State Labor Relations Board at its Southern Regional Office, in writing, within seven (7) days from the date hereof, as to the steps it has taken to comply herewith."

Triboro moved at Special Term for an order setting aside the order of the Labor Board. The Labor Board impleaded Amalgamated and made a cross-motion for an order enforcing that order and for other relief. The motion of Triboro in which Amalgamated joined was granted and the cross-motion of the Labor Board was denied. The decision and order of the State Labor Board dated July 5, 1940, as well as the certification of the Board of Transport Workers Union of America, as bargaining representative, was set aside. The Appellate Division, one justice dissenting, affirmed the order of Special Term. It held that the agreement for a closed shop and for the employment by Triboro only of members of Amalgamated is valid and that, so long as that contract continues in force, that union is the sole bargaining representative of all employees of the Triboro.

The validity, at the time it was made, and the fairness of the original contract are not questioned. True, though denominated a " collective agreement," it was not made with employees of Triboro for, as we have said, at that time no franchise had yet been issued to Triboro. It operated no bus line and had no employees; but as the Labor Board has found it was " the established policy of the administration of the city of New York, adopted long prior to the passage " of the New York State Labor Relations Act, that " no franchise would be granted unless the recipient agreed in advance to enter into a collective agreement with a *bona fide* labor organization. The City did not choose the bargaining agency. No choice was presented, since the Amalgamated was the only labor organization active in advancing the interests of employees engaged in the operation of buses. Neither the T. W. U., which did not come into existence

until early in 1937, nor any other labor organization was seeking to represent these employees in January, 1936, when the contract was executed."

In the New York State Labor Relations Act the Legislature, for the first time, formulated in a statute the public policy of the State in respect to collective bargaining by employees and in respect to any limitation of legal sanction of contracts made with unions for closed shops. Unquestionably, at least until that time, a labor union and an employer could freely enter into a binding contract whereby the employer assumed an obligation, enforceable by courts at the instance of the labor union, to employ only members of the union. We have so said in *Williams* v. *Quill* (277 N. Y. 1).

The New York State Labor Relations Act was adopted to promote the public policy of the State, therein declared, " to encourage the practice and procedure of collective bargaining, and to protect employees in the exercise by workers of full freedom of association, self-organization and designation of representatives of their own choosing for the purposes of collective bargaining or other mutual aid and protection, free from the interference, restraint or coercion of their employers." This declared public policy is based upon the legislative finding that " Experience has proved that protection by law of the right of employees to organize and bargain collectively, removes certain recognized sources of industrial strife and unrest, encourages practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and tends to restore equality of bargaining power between and among employers and employees * * *." (§ 700, amd. L. 1937, ch. 443.) .

In order to carry out that policy the statute provides, among other things, that " employees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid

or protection, free from interference, restraint, or coercion of employers." (§ 703.) This right of employees to " form, join, or assist labor organizations * * * of their own choosing " free from interference, restraint or coercion of employers, is safeguarded and protected by the inclusion of the following acts in the list of unfair labor practices specified in section 704, in which an employer may not engage:

" 4) To require an employee or one seeking employment, as a condition of employment, to join any company union or to refrain from forming, or joining or assisting a labor organization of his choosing,"
and

" 5) To encourage membership in any company union or discourage membership in any labor organization, by discrimination in regard to hire or tenure or in any term or condition of employment: Provided that nothing in this article shall preclude an employer from making an agreement with a labor organization requiring as a condition of employment membership therein, if such labor organization is the representative of employees as provided in section seven hundred five."

Except for the express proviso contained in subdivision 5 of section 704, there might be serious question whether the statute did not prohibit contracts between an employer and a labor union with " closed shop " provisions, for under the terms of such a contract all employees are required to be members of a particular union, and any employee is immediately subject to discharge if he joins another union. The proviso has removed such question. Contracts for closed shops thereafter made are lawful if made with a labor organization which is the " representative of employees as provided in section seven hundred and five." It has not removed the question whether employees whose continued employment is conditioned upon membership in a union which has made a valid contract for a closed shop may, while the contract is in force, choose another union to act as their representative to negotiate a new contract, superseding the existing closed shop contract, and

perhaps even containing a provision requiring all employees to be members of the new negotiating union. The courts below have in effect held that while a valid closed shop contract continues in force the members of the union which made the contract are not entitled to a certificate from the Labor Board that they have selected another union as their bargaining representative and that the employer cannot be charged with engaging in an unfair labor practice by refusing to negotiate with a union so selected, in respect to any matters covered by the existing valid contract.

In 1938, the Labor Board refused to order an election of employees of Triboro in order to determine whether the employees desired to be represented for purposes of collective bargaining "by Transport Workers Union of America, C. I. O., or by Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Local Division 1104, A. F. L." Triboro and Amalgamated now claim that this refusal constitutes a ruling by the New York State Labor Board, itself, that while a closed shop contract with one union is in force no other union may properly be certified as the representative of the employees for the purpose of collective bargaining. The Labor Board was created by a statute which was enacted a year and a half after Triboro's contract with Amalgamated was made and the Labor Board derives all its powers from that statute. When application was made to the Board for the exercise of its powers in order to enable employees to choose representatives to negotiate a contract fixing the terms of their employment, though a contract fixing such terms for a definite period was then in force, the Board did not fail to recognize that there might be serious question whether the statute was intended to vest the Board with power to impair the obligations of a contract previously made and whether the statute would be valid if it purported to confer such powers. Amalgamated and Triboro could, if they chose, negotiate a new agreement containing different terms and conditions, but it is clear that Triboro could not, by negotiations with another union, divest itself of the obligation,

which it had assumed by its contract with Amalgamated, to employ only members of Amalgamated in accordance with the terms and conditions fixed by that contract. If Triboro negotiated a contract with Transport Workers Union or any other union, or even with individual employees, to employ persons who are not members of Amalgamated, Triboro would assume a new contractual obligation inconsistent with its obligation to Amalgamated. Performance of the contract with one union would constitute a breach of its contract with the other union. Triboro and Amalgamated urged in 1938 that such considerations constitute cogent reasons why Triboro should not and cannot be compelled to negotiate with any representatives of its employees, other than Amalgamated, for a contract which could not be performed without breach of the existing valid contract with Amalgamated, and why the Labor Board should not direct an election to determine whether the employees desired that Transport Workers Union should represent them in negotiating such a contract. The Labor Board concluded that an election for such purpose should not be ordered at that time. It did not decide that it had no power to order such election, even while a valid contract, made before the statute was enacted, is in force; but it concluded that under the circumstances there presented " the direction of an election in this case would defeat, and not effectuate, the policies of the Act " and it found that " it would be contrary to the policy of the Act were we to conduct an investigation or issue a certification in this particular matter." The Board thereupon dismissed the petition for such relief but " without prejudice to the right of the said Transport Workers Union of America to file a new petition for investigation and certification within any reasonable period prior to the expiration of the present contract."

On July 20, 1939, the Transport Workers Union filed its new petition, three days after Amalgamated had sent to Triboro the letter in which it stated that it was " enclosing a new contract." The terms of the original contract

would end on October 20, 1939, subject to the proviso in the contract that it would " continue automatically " for another period of three years unless either party notified the other party at least ninety days before the " expiration of the then current term " that it elected to terminate the contract.

On September 27th, when the Board began hearings on the petition, and on October 30th, when it made its decision directing an election, Triboro and Amalgamated had not yet agreed upon the terms of a new contract, though it is said that the negotiations which resulted in the new agreement made in November were then in progress. The primary question here presented is whether in negotiations held at that time for a new contract, the employees of Triboro had the right, under the provisions of the statute, to select as their bargaining representative any union organization or group other than Amalgamated, membership in which was a condition of employment by Triboro.

The Labor Board has made findings of fact that " on or before July 17, 1939 " Amalgamated elected to " terminate the collective bargaining agreement between Amalgamated and Respondent at the expiration of the then current term." The courts below have held that this finding is not supported by any substantial evidence and that by inaction of both contracting parties the term of the contract with Amalgamated for a closed shop was " automatically continued " for an additional term of three years, and that during that term Triboro could not lawfully make an agree-. ment with any other union fixing different terms and conditions of employment. It is plain that, if the original contract was not automatically continued, Triboro had no right to enter into a new contract for a closed shop with Amalgamated, unless Amalgamated was then acting as " the representative of employees as provided in section seven hundred and five;" and for more than a year Transport Workers Union had claimed that it was the proper representative, desired by a majority of the employees.

The constitution of Amalgamated provides that " no contracts of any kind shall be entered into to exceed a period of three years by any local division of this association; and where the continuous contract form is used it shall be so provided as to open every year if possible and in no case shall it exceed the provision of three years without being opened for revision." Any contract may, of course, be revised at any time by consent of both parties, but so long as it remains in force either party has the right to insist upon exact performance in accordance with its terms and may refuse to change those terms. The contract made in 1936 for a term of three years provides for automatic renewal if both parties are satisfied with its conditions, but three months before the end of each three-year term, either party may refuse to continue the contract in force and seek a new contract. The provision giving either party the right to refuse to continue the contract accords with the policy embodied in the rule of Amalgamated that each contract shall be " opened for revision " at least every three years. If, however, before both parties had agreed upon the terms of a new contract, the original contract was automatically continued for another term of three years, the parties would be in exactly the same position as if the original term had been six years. The contract would no longer be open for revision except by common consent.

The letter of July 17, 1938, does not in express terms state that Amalgamated has elected to terminate the contract at the end of the current term, but the Labor Board has read into the letter by implication a notice of such election. At that time Amalgamated desired to obtain a new contract with more favorable terms, but no new contract had been executed and only a few days remained before the original contract would be automatically renewed unless notice of election to terminate had been served previously. If Amalgamated served such notice, Triboro might refuse to negotiate a new contract with it and Transport Workers Union might be selected as the representative of the employees; if Amalgamated served no notice Triboro

might refuse to revise the contract and might insist upon the performance of its original terms. The evidence indicates that the letter of July 17th was sent by Amalgamated with the intention of avoiding the dilemma.

In the letter in which " a copy of the new contract " was enclosed, there is reference to Mr. Wickers, the president of the local, and to Mr. Clark, an international officer of Amalgamated. Both testified at the hearing before the Labor Board. Excerpts from the testimony of Mr. Wickers follow. Direct examination: " Q. And this letter and contract which was inclosed was sent pursuant to paragraph 11 of your agreement, is that right? (Document handed to witness.) Will you look at that? A. Well, not according to this wording. We did not terminate the contract. Q. Well, you asked for a new contract with changes? A. Subject to conditions in your new contract there was different changes as far as conditions and scale of pay was concerned. Q. *And it was not your intention to continue the old agreement that existed as is for another three years, was it? A. Oh, no.*"

Cross-examination: " Q. This letter called for and produced and now in evidence as Petitioner's Exhibit XIV was sent by your instruction to the company by the financial secretary of the local division? A. Yes, sir. Q. *And it in effect was to open negotiations for a new contract, is that so? A. That's right.* Q. In other words, you had a contract, you wanted certain changes, you drafted a new contract, that is, changes in form and substance and sent it on to the company? A. That's right. Q. As a step in negotiations, is that correct? A. That's correct. Q. And Mr. Clark sat in these negotiations, did he not? A. That's right. Q. Will you state for the record, please, who Mr. Clark is? A. Mr. Clark is international officer of the Amalgamated Association."

Mr. Clark then gave testimony giving added force to the testimony of Mr. Wicker. We quote from the record of his examination. Direct examination: " Q. We have in evidence here, Mr. Clark, the Constitution and General Laws of

the Amalgamated. You are familiar with the provisions there with respect to contracts, are you not? A. Yes. Q. Is it customary — strike that. Do you know whether or not many local divisions of the Amalgamated have an automatic renewal clause in it? A. Yes, we have that clause in all of our contracts, practically all of them. Q. Practically all? A. Off-hand I believe they are all. Every contract I make I have that clause in them. Q. Now, you know, don't you, Mr. Clark, that notices have gone out from local divisions many times * * * calling for changes in an existing contract where the contract has such an automatic renewal clause, don't you? A. Yes. We send out notices to open up certain sections or amending the contracts and asking for additional clauses. Q. Is that a usual way to open negotiations looking for changes of contract? A. Yes."

Cross-examination: " Q. Is it your contention that if the employer turns down every one of your demands for another three years you have got to have it the next three years, same wages, same hours? A. No, absolutely no."

The conclusion is inescapable that the letter of July 17th was intended to open the original contract for revision and as a first step in negotiating changes. Whether the evidence would sustain a finding that the letter constituted a notice of election which would render inoperative the automatic renewal clause contained in the original contract, might present a doubtful question if thereafter Triboro and Amalgamated had failed to agree upon the terms of a new contract and a controversy had arisen between them concerning the automatic renewal of the old contract. The problem here presented is different.

The original contract was, as we have already said, valid when made in 1936, though under the statute passed a year later an employer would be guilty of an " unfair " labor practice prohibited by the statute if he made a contract with similar provisions for a closed shop with a union which had not been selected as bargaining representative by the

employees. Not only was the contract valid at the time it was made, but in making such a contract with the only legitimate union then in the field, Triboro was acting in strict accordance with the spirit if not the letter of the later statute, and we find in that statute no indication of any intention by the Legislature, even if it had the power, to impair any binding obligation of the contract. The contract must be accorded the same force as if it had been made in manner expressly sanctioned by the statute.

In examining anew the law as it was, even before statutes were enacted enlarging and safeguarding the rights of workers to combine and to strike, this court has said recently: " A labor organization is permitted to combine and to strike in a particular industry for the purpose of obtaining employment for its own people, even to the extent of excluding others from the entire industry who are not union men." (*Williams* v. *Quill, supra,* p. 7, opinion by CRANE, Ch. J.) That right to combine and strike for the purpose of obtaining a closed shop contract, may be exercised even though a closed shop contract exists with another union. (*Stillwell Theatre, Inc.,* v. *Kaplan,* 259 N. Y. 405, 417.) In vindicating that right, the courts have not failed to recognize that, when two unions compete for members within the same field and each is seeking by combination and strike to compel an employer to make a closed shop contract, the employer may, without fault of his own, suffer undeserved injury — at times even economic ruin. He may be entirely willing to accord to his employees the right of collective bargaining and to grant all demands made by either union in respect to wages, hours and conditions of employment; yet, an agreement with one union will inevitably bring conflict with the other. Experience has shown clearly that industrial strife, from its nature, must bring some injury to both parties to the conflict, though the conflict may be settled thereafter by an agreement which improves conditions in the industry and ultimately benefits both labor and capital; but in industrial strife caused by the existence of competing labor organizations there is multiplication of

probable injury and the probability of compensating benefit ultimately resulting to either workers or employers from the conflict, is in the same degree reduced. None the less, under the well-established policy of this State, embodied in Constitution, statutes and judicial decisions, the right of workmen to organize to better their conditions has long been recognized and fully protected. They may join an existing union or they may form new unions for such purpose, and " strikes " called by a union to induce an employer to employ only members of that union upon terms and conditions satisfactory to it, are lawful so long as only peaceful picketing and other lawful means of persuasion are used to bring about the desired result.

So this court has said in *Stillwell Theatre, Inc.,* v. *Kaplan* (*supra,* p. 409): " The employer, if threatened in his business life by the violence of the unions or by other wrongful acts might have the aid of the court to preserve himself from damage threatened by recourse to unlawful means, but the right of the workmen to organize to better their condition has been fully recognized. The fact that such action may result in incidental injury to the employer does not in itself constitute a justification for issuing an injunction against such acts. The interests of capital and labor are at times inimical and the courts may not decide controversies between the parties so long as neither resorts to violence, deceit or misrepresentation to bring about desired results. (*National Protective Assn.* v. *Cumming,* 170 N. Y. 315; *Paine Lumber Co.* v. *Neal,* 244 U. S. 459, 471; *Bossert* v. *Dhuy,* 221 N. Y. 342.) " That is true alike where the dispute is between employer and employee and where the dispute is between rival labor unions. It is true even where none of the employees are members of the labor organization which is conducting the strike and the employer has a closed shop contract with another union. As we said in the same case, prohibition of such acts of a labor union " might strike a death blow to legitimate labor activities. It is not within the province of the courts to restrain conduct which is within the allowable area of economic conflict " (p. 412).

What was decided in that case and what was said in the opinion of the court written by POUND, Ch. J., has been made the statutory law of the State by chapter 477 of the Laws of 1935, which added section 876-a to the Civil Practice Act. In a case involving or growing out of a labor dispute, no order may be issued by any court or judge prohibiting any person or persons acting singly or in concert from:

" (1) Ceasing or refusing to perform any work or to remain in any relation of employment;

" (2) Becoming or remaining a member of any labor organization * * * regardless of any agreement, undertaking or promise; * * *

" (5) Giving publicity to and obtaining or communicating information regarding the existence of, or the facts involved in, any dispute, whether by advertising, speaking, picketing, patrolling any public street or any place where any person or persons may lawfully be, or by any other method not involving fraud, violence or breach of the peace; * * *

" (7) Assembling peaceably to do or to organize to do any of the acts heretofore specified * * *

" (11) Doing in concert of any or all of the acts heretofore specified on the ground that the persons engaged therein constitute an unlawful combination or conspiracy or on any other grounds whatsoever." (§ 876-a.)

A " labor dispute," as defined in that section, " includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the relation of employer and employee."

When the Legislature in 1937 enacted the New York State Labor Relations Act, it, of course, did not repeal, expressly or by implication, any provision of section 876-a of the Civil Practice Act enacted two years before; or make unlawful any act performed singly or in concert in

connection with a labor dispute which was previously sanctioned by our law. No one, indeed, has ever contended otherwise. The new statute recognized, none the less, the injury which may result from the disruption of peaceful relations between employers and employees and the evils which flow from resort by employees, acting singly or in concert, to measures which, though not prohibited by law, are calculated to produce such disruption. Its declared purpose is to remove " certain recognized sources of industrial strife and unrest " and to encourage " practices fundamental to the friendly adjustment of industrial disputes " and thus to reduce the field of disruptive industrial strife. To carry out that policy the Legislature has sought to give added safeguards to the right of employees to organize and bargain collectively for the adjustment of labor disputes by the peaceful method of collective bargaining through " *representatives of their own choosing,*" free from interference, restraint or coercion of employers and to make the exercise of that right by employees more effective. The statute has not outlawed methods previously lawful — it seeks to encourage the use of peaceful methods by making such methods more effective and, at the same time, fair to all concerned.

Because closed shop contracts compel employees to become and remain members of the union with which the contract is made, the new statute provides that such contracts may be made only where the union has previously been authorized by the employees to represent them in negotiating such a contract. Section 705 provides the manner in which representatives for collective bargaining may be designated or selected. That section provides, among other things:

" 1. Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes or by the majority of the employees voting in an election conducted pursuant to this section shall be the exclusive representatives of all the employees in the appropriate unit for the purposes

of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, that employees, directly or through representatives, shall have the right at any time to present grievances to their employer. * * *

" 3. Whenever it is alleged by an employee or his representative that there is a question or controversy concerning the representation of employees, the board shall investigate such question or controversy and certify in writing to all persons concerned the name or names of the representatives who have been designated or selected. Whenever it is alleged by an employer or his representative that there is a question or controversy concerning the representation of employees, the board shall investigate such question or controversy after a public hearing held upon due notice. In any such investigation the board shall provide for an appropriate hearing upon due notice, either in conjunction with a proceeding under section seven hundred six or otherwise, and may conduct an election by secret ballot of employees, or use any other suitable method to ascertain such representatives (either before or after the aforesaid hearing), provided, however, that the board shall not have authority to investigate any question or controversy between individuals or groups within the same labor organization or between labor organizations affiliated with the same parent labor organization."

Employees who join a union formed for collective bargaining, do so, it may be assumed, in order that they may be effectively represented in collective bargaining and in adjustment of disputes by such union. It follows that where no employee alleges that there is a controversy concerning the representation of employees and it is apparent that all or even a majority of the employees have joined and have remained members of the union without coercion by the employer, the employer may, we assume, make such a contract with the union. After such a contract is made, an employee might prefer to join a different, perhaps a newly organized union, and to have that union represent

him in bargaining with the employer and in adjustment of disputes concerning wages, hours and other terms and conditions of employment. He cannot join a different union while the contract is in force without giving the employer cause for his discharge. He may, of course, if he chooses, join a different union and may join in a strike called and conducted by that union in order to obtain a contract which might contain different provisions fixing the terms and conditions of employment and also a provision that only members of that union may be employed, but the court is now holding that without disrupting the existing relationship of employer and employee, he cannot join other employees in like situation in choosing another union to represent the employees in the peaceful adjustment of industrial disputes and in negotiating a contract for employment upon satisfactory terms.

Though the statute in express terms sanctions contracts with a closed shop provision if made with authorized representatives of the employees, it does not, at least in express terms, prohibit the employees from choosing new representatives during the term of the contract. In the absence of such a prohibition, employees have a right to change their choice and, when that fact has been brought to the attention of the Board in manner provided in subdivision 3 of section 705, it is the duty of the Board to investigate the claim. (Cf. *Hamilton-Brown Shoe Co.* v. *National Labor Relations Bd.*, 104 Fed. Rep. [2d] 49.) The statute does, in express terms, confer upon the Board the duty and function of the " determination of the life " of the selected representatives. (§ 702, subd. 7.) We cannot read into the statute any implied exception where a valid contract for a closed shop has been made. Otherwise the parties might render the statute inoperative for as long a term as they chose. The existence of such a contract may be a factor, in some circumstances even the controlling factor, in the wise determination of " the life of the selected representatives." Industrial peace is not promoted by a frequent reopening of discussions of the terms and conditions of employment, fixed

by contract *made after negotiations* between employer and employees, bargaining collectively through their authorized representatives. That is true where the reopening of the contract is demanded by new representatives of the employees' selection, and it is true when it is demanded by striking employees or by a rival union. We are asked to read into the statute an exception rigidly excluding employees from the statutory protection of their right to choose freely their representatives to adjust by peaceful negotiation industrial disputes with their employer, though the employees would then be relegated to the destructive remedy of a strike in order to be able to join another union without loss of employment. Such an exception is not justified by the language of the statute and would thwart its declared purpose of facilitating settlement of industrial disputes by peaceful negotiation.

Because, as we have said, we find that the statute was not intended, and we assume could not, impair the obligations of the closed shop contract of 1936, and because that contract must be given the same force as a valid closed shop contract made in manner sanctioned by the statute, we have, in this opinion, discussed the statutory rights of employees to change their choice of bargaining representatives after a valid closed shop contract has been made with a union acting as " the representative of employees as provided in section seven hundred five," though the closed shop contract of 1936 was made before the statute was enacted and was not made with the union while it was the representative of the employees. Negotiations conducted with a different union would not necessarily result in agreement upon a contract which would impose upon the employer obligations in conflict with the existing closed shop contract and compulsion to negotiate would not directly impair the obligations of the existing contract. Impairment of the existing contract would follow only if compulsion to negotiate includes compulsion to agree; but it may be argued that compulsion to negotiate is futile unless the negotiation is expected to result in a contract which might conflict with

an earlier contract and cause unlawful impairment of its obligations. We assume, but need not now decide, that during the original term of three years from October 20, 1936, compulsion exercised upon Triboro to negotiate, in accordance with the statute, with a union other than Amalgamated would have impaired the obligation which Triboro had assumed towards Amalgamated and from which Amalgamated alone could release Triboro. Triboro was not, however, under any obligation to continue the contract for an additional term of three years, even if Amalgamated so desired. The contract would be automatically renewed only if both so chose and it is clear that the State could, in the exercise of its police power, without impairment of any existing contractual obligation, impose upon the voluntary continuance of the contract, for a second period, the same reasonable restrictions as it could place upon an employer's freedom to contract in other form. A decision that a closed shop contract which contains a provision for automatic renewal for an additional period remains valid during such additional period, though at the time when either party could give notice of termination the parties could not make a new closed shop contract without violation of the statute, means that not the State but the parties to the contract decide whether the declared public policy of the State should be enforced.

We are not concerned with technical distinctions which might determine the question whether the letter of July 17th constituted a notice of election by Amalgamated not to continue the contract or a notice only that Amalgamated expected to negotiate a different contract. Fine spun technical distinctions have no place in the determination of statutory or constitutional rights of workers and employers in the settlement of labor controversies. There can be no doubt that on July 20th the contract could not be renewed or continued unless both Triboro and Amalgamated agreed, and both Triboro and Amalgamated knew long before that time that Transport Union Workers claimed that a majority of the employees of Triboro desired that it should be their

bargaining representative. Since only by consent of both parties could the obligations of the existing contract continue in force after October 20th, no impairment of any contractual obligation of Triboro after that date could follow from enforcement of the statutory requirement that an employer may make a closed shop contract only with a union acting as the representative of the employees. We have referred to the provisions of subdivisions 4 and 5 of section 704. Under those subdivisions it is clear that Triboro could be charged with an unfair labor practice if, after the expiration of the original term of the contract, it chose to require an employee, as a condition of employment, to refrain from joining or assisting a labor organization of his own choosing or if it chose to discourage membership in such union by discrimination in favor of members of Amalgamated, unless Triboro's closed shop agreement with Amalgamated was renewed or a new agreement made *while Amalgamated was in fact the representative of employees as provided in section 705.*

The only serious question which remains is whether on July 20th when Amalgamated applied to the Labor Board for investigation of the " question or controversy  *  *  * concerning the representation of employees " of Triboro, or on November 14th when the new contract was ratified by members of Amalgamated, or on November 27th when the Board ordered an election, Amalgamated was in truth the " representative of employees as provided in section seven hundred five." We have quoted the provisions of the sections which affect that question. Such representatives may be designated as provided in the statute in either of two ways: (1) By designation or selection by the majority of the employees in a unit appropriate for such purpose, *or* (2) by the majority of the employees voting at an election which the Board has directed. Concededly Amalgamated was not selected by a majority of the employees voting at the election ordered by the Board and held on November 27. It is claimed, however, that Amalgamated was selected by a majority of the employees in other manner permitted by the statute.

Though the statute provides alternative methods of designation or selection, the employer is not entirely free to decide which method shall be used. If there is question or controversy the Board must investigate and must decide whether an election shall be ordered. An employer may proceed without a certificate from the Board, where no doubt exists and where it is " entirely apparent from other sources that one set really represents the majority." (*National Labor Relations Board* v. *Remington Rand, Inc.*, 94 Fed. Rep. [2d] 862, 868.) When, however, an employee or his representative or an employer or his representative alleges that question or controversy exists, the Board is under a duty to investigate and may order such an election. Pending such investigation and election, the employer may not proceed to negotiate and to make a contract with a union not certified as the " representative of employees " by the Board, which alone is charged by the State with power and duty to investigate and decide the controversy, nor may the employer refuse to negotiate with the representative thereafter accredited by the Board, on the plea that another was selected as the representative by the employees, at least unless the representative was selected in manner which left open no further possible question or controversy concerning the representation of employees.

Triboro and Amalgamated attack on several grounds the election held on November 24th. Both were given opportunity to object to the terms and conditions of the order directing that such an election be held. They opposed any election on the ground that Triboro could not be compelled to negotiate with any union other than Amalgamated. They did not avail themselves of the opportunity to object to the terms and conditions stated in the order. They have not now presented any sufficient reason why the order for the election, or the election, should be annulled. They urge that since all the employees of Triboro were members of Amalgamated on November 14th, when the new closed shop contract with Amalgamated was ratified, and since a great majority of those employees voted in favor of the ratifica-

348

tion of the contract, it conclusively appears that Amalgamated was at that time the representative selected by the employees. If that ratification did conclusively establish that at that time the employees selected Amalgamated as their representative to negotiate a contract, then it might perhaps be argued that the controversy or question concerning representation, which the Board was investigating, no longer existed and that the Board could not continue its investigation or order an election.

In truth, the ratification did not establish conclusively, and perhaps was no evidence, that at that time the employees authorized Amalgamated to represent them or confirmed the authority under which it had assumed to act. The employees were at that time members of Amalgamated but membership was required by the closed shop contract which Amalgamated and Triboro claimed was continued automatically for another period. The new contract negotiated by Amalgamated was, all agree, more favorable than the old contract which it was intended to supersede. The employees were not offered the choice of accepting the new contract made with Amalgamated or of insisting upon their right to choose a different union as their representative. The choice they were offered was only between two closed shop contracts, both negotiated by Amalgamated. They chose the more favorable contract but their choice is certainly not conclusive evidence that they would not prefer a closed shop contract with another union freely selected by them.

Ten days later, at the election ordered by the Board, the employees chose Transport Workers Union as their representative. We agree that such election does not conclusively show that the employees would have made the same choice on November 14th. Perhaps, as Amalgamated and Triboro argue, ratification of the favorable closed shop contract with Amalgamated on November 14th may have influenced the employees to seek a new contract on terms even more favorable. We may not conjecture about that. Even if it were true, Triboro and Amalgamated may hardly complain of the result of their own action, voluntarily taken,

in negotiating a contract while the Board was still investigating the question or controversy concerning representation of employees. The election of November 24th, held in accordance with the order previously made by the Board, constituted a valid designation on November 24th of the representative of the employees.

In accordance with the provisions of the statute the employees may insist upon their right to adjust industrial disputes with their employer by peaceful negotiations conducted by Transport Workers Union, designated by them in manner provided by statute. They cannot be compelled to resort to a strike to settle such disputes.

The orders of the Special Term and the Appellate Division should be reversed and the motion for an order enforcing the order of the Labor Board should be granted.

RIPPEY, LEWIS and CONWAY, JJ., concur with FINCH, J.; LEHMAN, Ch. J., dissents in opinion in which LOUGHRAN and DESMOND, JJ., concur.

Order affirmed.