[L. A. No. 25745.   In Bank.   Aug. 15, 1961.]

DON H. SHEETS, Individually and on behalf of the Brotherhood of Railroad Trainmen, Plaintiff and Appellant, v. LOS ANGELES METROPOLITAN TRANSIT AUTHORITY, Defendant and Respondent.

Bodle, Fogel & Warren, Bodle & Fogel, George E. Bodle, Daniel Fogel and Stephen Reinhardt for Plaintiff and Appellant.

Musick, Peeler & Garrett, Gerald G. Kelly, Roderick M. Hills and Frederick B. Warder, Jr., for Defendant and Respondent.

PETERS, J.—The legal problem involved on this appeal is a limited one. The facts, however, are somewhat complicated.

Prior to March 3, 1958, there were two transit companies furnishing mass transit in the Los Angeles metropolitan area. One was the Los Angeles Transit Lines, primarily an urban system, and the other was Metropolitan Coach Lines, primarily an interurban system. Both companies had collective bargaining agreements with separate unions. Los Angeles Transit Lines had such an agreement with the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of American (hereafter referred to as Amalgamated) which covered about 2,100 employees. This agreement was to continue until May 31, 1959, and from year to year thereafter in the absence of a 60-day notice of termination by either party. There is no contention or evidence that such a notice was ever given. Metropolitan Coach Lines had several such agreements, the major one being with the plaintiff and appellant the Brotherhood of Railway Trainmen (hereafter referred to as Brotherhood) which covered about 1,047 employees. This agreement was to continue until November 30, 1959.

In 1957, as a result of the passage of the Metropolitan Transit Authority Act of 1957 (Stats. 1957, ch. 547, p. 1609) (hereafter referred to as the Act), there was created the Los Angeles Metropolitan Transit Authority (hereafter referred to as the Authority). That statute empowered the Authority to acquire existing facilities from publicly or privately owned public utilities. Pursuant to this grant of power, the Authority on March 3, 1958, acquired the operating facilities of Los Angeles Transit Lines and of Metropolitan Coach Lines. The Authority assumed and agreed to be bound by the Brotherhood and Amalgamated collective bargaining agreements that those unions had with the acquired companies. This is required by the Act. Section 3.6, subdivision (e), provides, in part, that

"Whenever the authority acquires existing facilities from a publicly or privately owned public utility, either in proceedings by eminent domain or otherwise, the authority shall assume and observe all existing labor contracts. . . . No employees of any acquired public utility shall suffer any worsening of his wages, seniority, pension, vacation or other benefits by reason of the acquisition."

Under this provision, the Authority from the date of acquisition of the two transit companies on March 3, 1958, and until May 21, 1959, recognized both the Amalgamated and Brother-

hood agreements as being in full force and effect. However, as of the latter date, it is the contention of the Authority, that both agreements were terminated as a matter of law. This contention is based on the following facts. After acquisition on March 3, 1958, disputes arose as to which union represented a majority of the employees, and over what employees were represented by which union. The Act provides for such situations. Section 3.6, subdivision (d), provides:

"If there is a question whether a labor organization represents a majority of employees or whether the proposed unit is or is not appropriate, such matters shall be submitted to the State Conciliation Service for disposition. The State Conciliation Service shall promptly hold a public hearing after due notice to all interested parties and shall thereupon determine the unit or units appropriate for the purposes of collective bargaining. In making such determination and in establishing rules and regulations governing petitions, the conduct of hearings and elections, the State Conciliation Service shall be guided by relevant federal law and administrative practice, including but not limited to the self-determination rights accorded crafts or classes in the Labor Management Relations Act, 1947, and the Railway Labor Act.

"The State Conciliation Service shall provide for an election to determine the question of representation and shall certify the results to the parties. . . ."

Pursuant to this section, Brotherhood filed with the State Conciliation Service a petition requesting certification as the exclusive bargaining representative of all the operating personnel employed by the Authority. This included operators formerly hired by both of the utilities taken over by the Authority. Amalgamated filed a similar petition requesting certification as the exclusive bargaining representative of certain employees, including all of the operating personnel. Several other of the unions representing various groups of maintenance personnel petitioned for certification as bargaining representative of the maintenance employees. Hearings were held, and the State Conciliation Service ruled that all operating personnel employed by the Authority constituted one unit appropriate for collective bargaining, and that all of the maintenance personnel constituted a second unit appropriate for collective bargaining. It directed that an election be held in each unit for the purpose of determining who should represent that unit. Elections were held in each unit. As a

result of those elections, on May 21, 1959, the State Conciliation Service certified Brotherhood as the collective bargaining representative of all of the operating personnel of the Authority, and Amalgamated was certified as the collective bargaining representative of all of the maintenance personnel. Thereafter, both Brotherhood and Amalgamated requested the Authority to recognize their existing collective bargaining agreements as covering all employees of the Authority for which they had been certified. The Authority contended that the merger of the two companies and the certification of the new bargaining representatives, as a matter of law, cancelled and terminated the two agreements as of the date of certification, May 21, 1959. Amalgamated agreed with the position of the Authority. Brotherhood did not. It thereupon brought this action to secure a determination that its collective bargaining agreement survived the certification, remained in full force and effect until its expiration date of November 30, 1959, and that such agreement applied to all the operating personnel of the Authority including not only the old employees of the Metropolitan Coach Lines, but also to the operating personnel formerly associated with Amalgamated and brought into Brotherhood by reason of the certification. The trial court determined that the certification of Brotherhood on May 21, 1959, as the new bargaining agent, as a matter of law, terminated the old and until then existing collective bargaining agreement. Brotherhood appeals.

In spite of the judgment in its favor to the effect that the old agreements had terminated, the Authority promised all of the employees of both unions that during the negotiations in good faith for new collective bargaining agreements, it would continue to abide by the old Brotherhood and Amalgamated agreements with respect to employees covered by such agreements prior to May 21, 1959. It has done so. The Authority entered into a new collective bargaining agreement with Brotherhood on January 28, 1960, covering all operating personnel of the combined properties. Thus the very limited controversy left open for consideration is whether the Authority was obligated to extend the coverage of the old Brotherhood agreement to the operating employees who, prior to May 21, 1959, were represented by Amalgamated but for whom Brotherhood became bargaining agent under the certification of May 21, 1959. It is our opinion that the holding of the trial court that certification terminated all existing contracts is wrong. We are also of the opinion that the posi-

tion taken by the Brotherhood that its old contract covered employees of the other merged company that also had a contract, is also wrong. The correct position is that under the terms of the Act here under consideration, the old Brotherhood contract survived certification, but after certification as before it was applicable only to those employees represented by Brotherhood prior to certification. The old existing contract of Brotherhood did not cover the employees represented by Amalgamated prior to certification. It will be noted that this holding is in exact accord with the voluntary position taken by the Authority after the certification.

It is quite clear that, under the facts of the present case, and under the pertinent provisions of the Act, the certification did not terminate the existing Brotherhood agreement. There seems to be no California case on the question, and the problem has not frequently been involved in other jurisdictions, nor has it been discussed often by the legal writers in this general field.[1] There are, however, a few pertinent authorities. In New York it has been held that ". . . there is nothing in this right of union members to select a new bargaining representative which would impair the sanctity of the obligations of the existing contract while that contract was still in force." (*Triboro Coach Corp.* v. *New York State Labor R. Board,* 286 N.Y. 314 [36 N.E.2d 315, 318].) (See also *West Virginia Pulp & Paper Co.* v. *Lewis,* 17 Misc.2d 94 [191 N.Y.S.2d 303, 308], the most recent of a series of intermediate appellate decisions in New York announcing the same rule, and the strong dicta to the same effect in *Modine Mfg. Co.* v. *Grand Lodge Intl. Assn. of Machinists,* 216 F.2d 326, 329.)

One respected author, on the general subject, has taken a contrary position. Cox, now Solicitor General of the United States, in an article entitled *The Legal Nature of Collective Bargaining Agreements* (1958), 57 Mich.L.Rev. 1, suggests, without supporting authority, that certification of a new bargaining agent should terminate existing agreements. He argues that this result should follow because many substantive provisions of such existing agreements may be intertwined

[1] A rather early discussion may be found in an article entitled *Change of Bargaining Representative During the Life of a Collective Agreement Under the Wagner Act* (1942) 51 Yale L.J. 465. A later discussion is to be found in an article entitled *The Board, the "Bar," and the Bargain* (1959) 59 Columb.L.Rev. 61, where the author (at p. 92) opposes a change in bargaining representatives impairing "in any way the provisions of an agreement which do not concern action by the representative as representative."

with the identification of a particular representative, or that an intervening certification might bring about new conditions that would not fit the existing agreement, or that forcing the union to adhere to the old agreement might not "preserve a sound, efficient production unit governed with some measure of industrial justice." (57 Mich.L.Rev. at p. 13.)

In several cases the National Labor Relations Board has found it unnecessary to determine the effect of an intervening certification upon an existing agreement (Hershey Chocolate Corporation (1958) 121 N.L.R.B. 901; Boston Machine Works Company (1950) 89 N.L.R.B. 59).

██ Whatever the general law on this subject may or should be, in the instant case the governing Act, although it contains no specific provision on the subject, contains several provisions which, by necessary implication, are determinative of the issue involved. Section 3.6, subdivision (e), of the Act has already been quoted. It expressly provides that when the Authority acquires utilities it "shall assume and observe all existing labor contracts," and that as a result of acquisition "[n]o employees of any acquired public utility shall suffer any worsening of his wages, seniority, pension, vacation or other benefits." Section 3.6, subdivision (d), also quoted above, provides for the certification of a new bargaining representative. Certainly, in view of the express provisions of section 3.6, subdivision (e), the Legislature could not have intended that neither the union nor the employer should be protected by any agreement from the date of certification and until a new contract was negotiated, even though there was an existing contract that had not expired. Such a result would inevitably cause a "worsening" of the "wages, seniority, pension, vacation or other benefits" of the employees, and would inevitably lead to labor strife, to the detriment of both the union and the employer.

It is true that certain provisions of the Brotherhood contract by their very nature, could not survive certification. Certainly, as will later be pointed out, the provision making Brotherhood the sole and exclusive bargaining agent of "all" of the operating personnel did not survive. ██ Nor could the provision of the Brotherhood contract applying to terminals survive. The Authority acquired many new terminals when it acquired Los Angeles Transit Lines. Because of the changed circumstances resulting from the acquisition of the two transit companies, the Authority, after acquisition and after certification, had the right to adjust the number

and location of its terminals. ▓▓▓▓ There may be other general provisions of the Brotherhood contract that did not survive after acquisition of the other company and certification, but neither acquisition of that other company, nor certification, could adversely affect any of the provisions relating to "wages, seniority, pension, vacation or other benefits" enjoyed by the former operating employees of either of the two acquired companies. Therefore, the judgment of the trial court determining that the Brotherhood agreement terminated as a result of the certification was clearly erroneous.

▓▓▓▓ The contention of Brotherhood that its old agreement, after certification, extended to the operating personnel formerly represented by Amalgamated is also erroneous. To so hold would adversely affect some of the basic rights of the employees represented by Amalgamated and enjoyed by them under their old agreement, and so would violate the provisions of section 3.6, subdivision (e), of the Act. Although some of the provisions in the two agreements were substantially identical, some were radically different. Particularly is this so in reference to seniority and pension rights.

Brotherhood's agreement provided for "one operating seniority roster embracing all operators." It also provided that "Seniority rights of employees who are transferred to the Company, in an occupation within the scope of this Agreement, from properties acquired, in whole or in part, by the Company shall be governed by appropriate agreement between the Company and the Brotherhood." Amalgamated's members had certain contractually guaranteed rights under their contract. These rights would terminate and become subject to negotiation between Brotherhood and the Authority, if the Brotherhood contract were to apply to them.

The clause in Brotherhood's agreement in reference to a pension plan required for eligibility that employees be 65 years of age and have 25 years of service with Metropolitan Coach Lines or a number of other named transit companies. But Los Angeles Transit Lines was not listed. Thus, the years of service with Los Angeles Transit Lines which counted on the retirement program in the Amalgamated agreement would not count toward retirement under the Brotherhood agreement.

Moreover, Amalgamated had a group life insurance program provided in its collective bargaining agreement; Brotherhood did not.

Those adverse effects on the rights of the operating personnel represented by Amalgamated guaranteed to them by the old Amalgamated agreement are prohibited not only by the portion of section 3.6, subdivision (e), of the Act already quoted, but to inflict them on such employees would also be inconsistent with another provision of that section, which reads as follows:

". . . To the extent necessary for operation of facilities, all of the employees of such acquired public utility whose duties pertain to the facilities acquired shall be appointed to comparable positions in the authority without examination, subject to all the rights and benefits of this act, and these employees shall be given sick leave, seniority, vacation and pension credits in accordance with the records and labor agreements of the acquired public utility. Members and beneficiaries of any pension or retirement system or other benefits established by that public utility shall continue to have the rights, privileges, benefits, obligations and status with respect to such established system."

Nor is the contention of Brotherhood that to hold adversely to its contention would create chaos and foster labor strife entitled to serious consideration. The argument is made that unless Brotherhood's contentions are upheld, it would mean that workers working "side by side" would be subject to the different rules set forth in Amalgamated and the Brotherhood contracts. The Act requires that the employees of acquired companies shall be appointed by the Authority, so far as possible, to jobs comparable to those formerly enjoyed. The operating positions with the two companies here involved were not the same. Brotherhood's members were working on what was primarily an interurban system. Amalgamated's members were working on what was primarily an urban system. After acquisition the employees continued to perform their separate duties. They were not working "side by side." Nor does the record show any indication of "labor strife" before or after certification.

The major effect of the certification so far as the present problem is concerned was to require that thereafter Brotherhood was to administer the provisions of Amalgamated's agreement with Los Angeles Transit Lines so far as operating personnel were concerned until the new agreement was negotiated. This result follows from section 3.6, subdivision (c), of the Act which provides: "Employees shall have

the right . . . to bargain collectively through representatives of their own choosing. . . ." This provision, after certification, necessarily imposed on the Authority the duty to bargain exclusively with Brotherhood as to operating personnel. The certification of Brotherhood terminated the rights of Amalgamated, the defeated union, to represent the operating personnel. But the substantive provisions of Amalgamated's agreement relating to "wages, seniority, pension, vacation or other benefits" survived.

The fact that the Authority, after the judgment declaring that the Brotherhood's old contract was terminated, voluntarily agreed to and did recognize that contract and that of Amalgamated insofar as they applied to the operating personnel of the two acquired companies, which is precisely what this opinion holds that the law compelled the Authority to do, should not prevent a reversal of the judgment appealed from. That judgment held that Brotherhood's prior agreement terminated on May 21, 1959, by reason of the certification by the State Conciliation Service. Such a judgment, standing unreversed, might very well adversely affect in the future some very important rights of the employees represented by Brotherhood possessed by them from the date of certification until the date the new contract was negotiated.

The judgment appealed from is reversed.

Gibson, C. J., Traynor, J., White, J., and Dooling, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Vallée in the opinion prepared by him for the District Court of Appeal in *Sheets* v. *Los Angeles Metropolitan Transit Authority*, (Cal.App.) 12 Cal.Rptr. 213.

Schauer, J., concurred.

Respondent's petition for a modification of the opinion was denied September 13, 1961.