LAURIETTA E. YEHLE, Respondent, *v.* NEW YORK CENTRAL RAIL-
ROAD COMPANY, Appellant.
JOSEPH C. YEHLE, Respondent, *v.* NEW YORK CENTRAL RAILROAD
COMPANY, Appellant.

Fourth Department, December 30, 1943.

302

*Warnick J. Kernan* for appellant.

*Salvador J. Capecelatro* for respondents.

HARRIS, J. The plaintiffs, husband and wife, in these actions sought damages growing out of injuries sustained or alleged to have been sustained by the plaintiff wife as a result of an accident occurring while she was a passenger on a train of the defendant. The complaints set forth straight actions in negligence based on the claim that the operating employees of the defendant brought about the accident through their negli- gence in handling the train. The answers set up what are in effect general denials of negligence and in addition to such denials there is set forth in each answer allegation of a separate and complete defense to each complaint to the effect that for a good and valuable consideration each plaintiff " released and discharged the defendant from all claims, demands, causes of action and from all liability for damages of whatsoever kind, nature or description then existing or which might there- after arise from or out of injuries received by  *  *  * Laurietta Yehle, at or near Little Falls, State of New York, on or about the 19th day of April, 1940." The word " then " refers to the date of the release (the 9th day of September, 1940) and the date " 19th day of April, 1940 " refers to the

date of the accident out of which arose the alleged injuries and damages which are the bases of these suits. Each plaintiff replied to such separate defense by appropriate denials. By stipulation of the parties, the issues of release as set up in such separate defenses were separately tried before the trial court without a jury. The court below found in favor of the plaintiffs and held that the alleged release, being the document signed by the plaintiffs and the defendant on the 9th day of September, 1940, was given and accepted under a mutual mistake of fact and is not binding on the plaintiffs insofar as claimed unknown injuries are concerned, and is not a bar to this action. On the decision of the trial court on this issue, each plaintiff had judgment in his or her separate action dismissing the affirmative defense above stated. It is from such judgments that the defendant now appeals to this court.

In the trial court the plaintiffs made proof from which the trial court could find and did find that at the time the release now offered as a complete defense was signed, there existed, unknown to each of the plaintiffs and unknown to the defendant, certain injuries to the plaintiff wife which were the result of the accident to the plaintiff wife and symptoms of which became evident to the plaintiffs after the signature and delivery of the release. As the question which was litigated was one as to whether the release would cover unknown injuries not known to the parties to the release at the execution and delivery of the release, and was not a trial of the existence or nonexistence of such alleged unknown injuries (*Le Francois* v. *Hobart College,* 31 N. Y. S. 2d 200, 262 App. Div. 802, 262 App. Div. 811, affd. 287 N. Y. 638) the defendant on the trial below made no proof controverting the existence of such claimed unknown injuries.

The record before us shows the following stated evidence which, for the purpose of disposing of the issue of release, may be regarded as proof of the facts therein stated. The plaintiff wife, Laurietta E. Yehle, at the time of the accident under discussion (April 19, 1940) was by occupation a teacher of nursing in nursery schools in the city of Utica, an occupation in which she had been engaged since 1936. Her salary was $100 a month. Prior to the accident, her only physical illnesses had been an appendectomy and common colds. Her weight at the time of the accident was around 150 pounds. She was born in October, 1909, in Pittsburgh, Pa., and at the time of the accident was thirty-one years of age. In her early years she was brought to Syracuse by her family and later, when

she was nine years old, her family home was established in Utica and she has been a resident of Utica ever since. She attended parochial grade schools in Syracuse and later in Utica, and following that attended an academy for two years; then she began training for the profession of nursing (in 1924); this course of study took three years at the Utica Memorial Hospital and she graduated therefrom as a nurse in 1927. Her training course included practical training and experience in the hospital and the study of anatomy, medicine and surgery. Following her graduation as a nurse, she worked in the General Hospital in Utica and then did nursing on her own. Her experience embraced all types and kinds of illnesses. She continued at nursing until 1936, when she went into the school nursing work in which she was engaged at the time of the accident. At the same time she worked at nursing she taught classes in first aid. She married in 1936 but continued in the nursery school until the time of the accident. Her husband, the other plaintiff, at the time of the accident was approximately thirty-four years of age and his formal education consisted of grade school, study in an academy and two years as a student at Hamilton College which institution he left in 1926. Except for a two-year enlistment in the army, he was employed in industrial establishments, including a brewing company, suburban railway and electrical manufacturing concerns and similar industries. His employment was successively in shipping departments, inspection, assembling of material and like occupations. In 1939 he had a nervous breakdown and for that reason left his employment. Both the husband and the wife were people of average, or more than average, intelligence and experience in life. On April 19, 1940, when the plaintiff wife was a passenger on the train which met with the accident, she was returning to Utica from Albany where she had attended a teachers' convention; she was riding in a day coach and sitting on the north side of the train and had as her companion in the seat a fellow-teacher. The accident was one of the terrific catastrophes that sometimes occur in railroading. Many of the passengers were killed and many were injured, among the latter being the plaintiff wife. The coach in which she was riding turned over, the roof came off, and through the roof she was thrown partly out of the coach. Due to the tremendous number of casualties which came from this accident, one Waldo C. Freeman, who was the Assistant Claim Agent of the defendant stationed at Albany, N. Y., and whose territory embraced a considerable part of New York State, including the scene of

the accident, moved to and made his headquarters at Little Falls. From this location he looked after the interests of the defendant in relation to the accident and in so doing visited and dealt with the persons injured in or who claimed to have been injured in the accident. The plaintiff wife was confined in a private room in the Herkimer Memorial Hospital at Herkimer. Mr. Freeman and his assistant, a Mr. Sampson, kept in almost constant touch with the individuals who were the victims of the accident and called once or twice a week on the plaintiff wife until her removal from the hospital July 13, 1940. For a long time the plaintiff wife was in most serious condition both mentally and physically. At the Herkimer Memorial Hospital she had the services of a Dr. Gallo, who was one of the men on service at the hospital and who did not represent the defendant. The result of his attendance on, observation of, and treatment of the plaintiff wife was available to and furnished to the plaintiff wife, the plaintiff husband and to the representatives of the defendant, Mr. Freeman and Mr. Sampson. During her hospitalization at the Herkimer Memorial Hospital, the defendant, through Mr. Freeman, had the plaintiff wife examined by Dr. Dickinson, one of their medical staff. Some time during her hospitalization the plaintiff wife was visited and observed by her own physician, Dr. Douglas, and later when she returned home from the hospital he assumed her care. The result of Dr. Douglas' examination and conclusions was made known to the defendant prior to the execution of the release. While she was in the hospital and after she returned home, and prior to the date of the execution of the release, she had certain plainly evident injuries and their effect. These injuries and their symptoms and effects consisted of a number of lacerations about the head, lacerations on the arm and leg, fracture of the nose bone, fracture of the left humerus, loss of use of the left shoulder and arm and injury to the right leg, which interfered with her walking, and continuous vaginal bleeding. At the time of the accident, the plaintiff weighed somewhere between 150 and 170 pounds, she testifying to the smaller figure and Dr. Gallo testifying to the larger figure, his testimony being a matter of opinion. Before she left the hospital, her weight was over 230 pounds. Prior to the execution of the release, some thought and attention was given to the cause of the increase in weight and it was ascribed to food and lack of exercise and effort was made to control the weight through diet and exercise. For a time while she was in the hospital, there was considerable serious thought given to the probable necessity for the amputation of her leg,

and after she left the hospital and to the time that the release was executed there was a probability that she would suffer a permanent incapacity in her leg.. During this period, from the time of the accident to the time of the execution of the release, she had trouble with her vision and with her memory. At the time of the execution of the release there were strong indications that the more serious of injuries which have been above detailed would continue and might be permanent. During the month of April, 1940, the plaintiff needed some ready money and, at her request and on behalf of the defendant, Mr. Freeman advanced to her the sum of $300. From time to time, while she was in the hospital, the defendant, through its agent, made various expenditures for clothing and for other needs of the plaintiff wife. At no time did either plaintiff pay anything for any expense growing out of the accident to the plaintiff wife. In July, 1940, about ten days prior to the discharge from the hospital of the plaintiff wife, there occurred the first discussion between the plaintiffs and the representatives of the defendant as to a possible settlement to be made by the defendant to the plaintiffs for their damages and the figure then mentioned by the representative of the defendant was $4,000. Mr. Freeman stated to the plaintiffs that it was possible that after she left the hospital her condition might improve to such an extent that she would not be given that amount of money, but the plaintiffs decided they did not desire to consider any settlement at that time; as she testified, they " wanted to wait and see how [her] injuries were coming along." At the time of this discussion the plaintiff wife had reached the stage when she could sit up in a chair in her hospital room. The question of settlement was left to the future.

The plaintiff wife returned home on July 13, 1940, and remained at her home for some time, except for a short revisit to the hospital and necessary calls on physicians. The plaintiffs testified that once while the wife was in the hospital and once while she was at home, and before the execution of the release, she and her husband made inquiry of Mr. Freeman as to the necessity and wisdom of plaintiffs having an attorney, but apparently they were satisfied with Mr. Freeman's statement that they could get just as good a settlement and save considerable expense by not having an attorney. Mr. Freeman said there was some talk of an attorney, but that he did not go to the extent of making the statements which the plaintiffs claimed. It is apparent that no serious thought was given by the plaintiffs to the question of seeking legal advice for them-

selves. The defendant assumed and paid for all of the expenses of the plaintiff wife and her husband growing out of the accident, including massage treatments, into the month of October, 1940, and this expenditure totaled at least $3,100. Following her return home from the hospital Mr. Freeman, on behalf of the defendant, kept in contact with the plaintiffs and made half a dozen visits to their home discussing what was apparent as to thr condition of the plaintiff wife and the question of a possible settlement. The plaintiff wife testified that the dealings were all pleasant. At times when Mr. Freeman called at the house and Mrs. Yehle was not at home, she wrote to Mr. Freeman asking him to call again and it is evident that both the plaintiffs, on one hand, and the defendant's representative, on the other hand, were seriously considering getting together on a settlement figure. These negotiations and this relationship continued until the 9th day of September, 1940, when, at the request of Mrs. Yehle (she, due to her absence from home, having missed a call from Mr. Freeman) Mr. Freeman called at the family home of the plaintiffs in Utica. He then and there offered the sum of $9,000 in full settlement of the claims. Mr. Yehle advised his wife to delay making a settlement, but she said that she was satisfied and her husband told her that it being her case he would do as she wished, and the release in question was drawn and executed. It was necessary that the same be acknowledged before a notary and, at the suggestion of the plaintiffs, Mr. Freeman accompanied them to a neighborhood store seeking a notary whom the plaintiffs knew, and that person being absent, these three parties went to the bank where the plaintiff wife and her husband did business and in the presence of two bank officers the plaintiff wife and her husband signed the release, acknowledged their signatures, and thereupon received from Mr. Freeman the company's check for $9,000. The release which was signed contained the following:

" Joseph C. Yehle and Laurietta E. Yehle, 1002 Lamb Street, Utica, New York. For the sole consideration of Nine thousand and no/100 Dollars, received to our full satisfaction from The New York Central Railroad Company, and without any other representation, promise or agreement, written or oral, We hereby release and discharge the said The New York Central Railroad Company from all claims, demands, grievances and causes of action of every kind whatsoever and including, but without limitation of the foregoing, all liability for damages of every kind, nature or description now existing or which may hereafter arise from or out of injuries and damages received

by the said Laurietta E. Yehle, and loss of and damage to her personal property at or near Little Falls, State of New York, on or about the 19th day of April, 1940.

" We have read and understand this release. L. E. Y. J. C. Y.

" In witness whereof, We have hereunto set our hands and seals this 9th day of September, 1940.

Joseph C. Yehle    [Seal]

Laurietta E. Yehle    [Seal]

" This is a General Release.

" This release was read by and signed by the said Joseph C. Yehle and Laurietta E. Yehle in our presence at Utica, New York, on the 9th day of September, 1940.

" 1. H. R. Gosling, witness 157 Genesee St., Utica, N. Y.

" 2. G. Albert Niles, Vice Pres. Oneida Cty. Bank, Utica, N. Y.

" 3. W. C. Freeman, DCA Albany, N. Y.

The New York Central Railroad Company

Audit No. 3327–40

" Month Sep. 1940. $9,000.00

Paid by draft No. CCA–1635

Claim Dept. File No. 272663

M-49384.

State of New York ⎱
County of Oneida ⎰ ss

" On this 9th day of September in the year of 1940 personally appeared before me Joseph C. Yehle and Laurietta E. Yehle, to me known and known to me to be the same persons described in and who executed the instrument on the reverse side of this paper, and acknowledged that they executed the same for the uses and purposes therein set forth.

[seal]   H. R. Gosling

Notary Public,

Oneida Co., N. Y."

On the day that the release was executed and prior to its execution, Mr. Freeman spent some three quarters of an hour with the plaintiffs at their home. The plaintiff wife testified in reference to the release, " Well, I read it. I don't know as I paid too much attention to it. I am sorry." In reply to the question, " There is nothing about the language of that release that you did not understand, was there?" she answered " No." Her husband testified that Mr. Freeman asked them both to read

the proposed release and that he read the same, and that he had in mind that there was a possible chance being taken by the plaintiffs in making the settlement on that day. Mr. Freeman testified that on the day of the settlement Mrs. Yehle had informed him that she fully expected to be back to work by September 1, 1941, and that he would not have settled without a full release. Mr. Gosling, vice-president and cashier of the bank, who took the acknowledgments to the release, testified that the release was read by the plaintiffs in his presence.

There is ample proof that at the time of the execution of such release the plaintiffs carefully read the same and understood its contents. There is also ample proof to establish the contention of the plaintiffs that at no time up to and including the execution of the release and the delivery of the check was there any thought on the part of the plaintiff, or of either one of them, or on the part of any representative of the defendant that Mrs. Yehle had incurred or was suffering from any injuries or symptoms other than those hereinbefore stated. The problem as to her future health which had been discussed was the possibility or probability of incapacity resulting from the then appreciated injuries and symptoms. The claim is now made and it is supported by proof, which for the purposes of this appeal must be taken as true, that as a result of the accident Mrs. Yehle, the plaintiff wife, sustained an injury to the pituitary gland which injury has increased her weight so as to make her decidedly ungainly and unwieldy, has injured her eyesight, her sense of smell and her sense of taste and her memory, and that such condition is becoming progressively worse. Mr. Freeman very frankly testified that until the trial of the issue below he was not even aware that there was a part of the body known as the pituitary gland. Proof is offered that that gland controls the functioning of other important glands of the body and their secretions and that such an injury and its consequences are permanently incapacitating. The plaintiffs' contention on trial was that so long as the settlement was made and the release given without the knowledge of unknown injuries on the part of both the plaintiffs, on one hand, and the defendant, on the other hand, such release is not effective as to the so-called alleged unknown injuries. On the trial of the issue, the court below held with the plaintiffs and against the defendant. This court must now pass on the question as to whether, if such unknown injuries did occur, the release given on the 9th day of September, 1940, covers such unknown injuries and the damages ensuing therefrom and so is a bar against this claim of the plaintiffs.

Based on the proof, the following two conclusions must be regarded as established:

*First:* At the time of the execution of the release and the delivery of the check, neither one of the plaintiffs nor the representative of the defendant knew that Mrs. Yehle was suffering from an injury to the pituitary gland, if she were so suffering, and the possibility of such an injury existing was not discussed at, or previous to, the execution of the release.

*Second:* The release was executed and received and the consideration therefor paid and received at a time and under such circumstances that both plaintiffs and the agent of the defendant intended that the paper should release the defendant on behalf of the plaintiffs, and each of them, from any and all liability to either of the plaintiffs, and both of them, growing out of the accident of April 19, 1940.

On the first proposition just above stated, the court found as indicated in this statement and on such finding declared the release to be invalid insofar as unknown injuries were concerned, and sustained the objection to the separate defense of release and struck such defense from each of the answers. The theory on which the court below acted was that there had been a mutual mistake on the part of the plaintiffs, on one hand, and the defendant, on the other hand, which mutual mistake would exclude from the general release any unknown injuries. This is the position that the respondents now take. The appellant takes the position that the release in question, having been entered into under such circumstances as hereinbefore detailed, each of the parties thereto had in mind a complete quittance between the plaintiffs, and each of them, on one side, and the defendant, on the other side, and, therefore, the defendant is not liable to the plaintiffs, or either of them, for the alleged so-called unknown injuries.

The theory of mutual mistake has from time to time been the basis for courts refusing to give full effect to general releases when it has been established (in an attack on the general release) that the release was not intended and should not be regarded as a general and full release between the parties thereto, but rather as a release of injuries known to a plaintiff at the time of settlement of a claim. (*Le Francois* v. *Hobart College,* 31 N. Y. S. 2d 200, 262 App. Div. 802, 262 App. Div. 811, affd. 287 N. Y. 638; *Barry* v. *Lewis,* 259 App. Div. 496, and cases cited therein; *Landau* v. *Hertz Drivurself Stations, Inc.,* 237 App. Div. 141.) An examination of these cases shows that there was present in the same a mistake or lack of knowl-

edge on the part of a plaintiff as to injuries received and some over reaching of the plaintiff by the defendant, or other circumstances from which it could be concluded that plaintiff and defendant did not intend the settlement to be in payment of unknown injuries, the knowledge and effect of which unknown injuries would appear after the settlement was made. In each one of said cases, there was haste on the part of the defendant in securing a release for a negligible sum or for no consideration from a trusting plaintiff. Bearing in mind the lapse of time from the date of the accident to the making of the settlement in September, 1940, the efforts of the plaintiffs, and each of them, to ascertain the full extent of the injuries which came to the plaintiff wife from the accident of April 19, 1940, the language of the release, the intelligence of the plaintiffs, the full knowledge that each plaintiff had as to what he and she were signing when they executed the release, the good faith shown by the agents of the defendant in endeavoring to ascertain what damage had come to the plaintiff wife through the accident, the honesty with which the plaintiffs, on one side, and the defendant's agent, on the other side, approached the question of settlement, the investigation made to the fullest possible extent by the defendant of the plaintiff wife's injuries, the substantial amount of money paid out by the defendant to and on behalf of the plaintiffs, the conclusion is reached that the settlement of the claim now under discussion was made by both parties with the intention that it should be a complete absolution of the defendant by the plaintiffs, and each one of them, from any liability for damage done to the plaintiffs, or either of them, on account of the accident. It is true that neither the defendant's agent nor either one of the plaintiffs had in his or her mind any thought that there were unknown injuries, but there is positive proof of good faith on the part of the defendant, and the record amply sustains the proposition that the plaintiffs signed the release with their eyes open to its effect.

So comes the question now to be passed on by this court as to whether the release should have been avoided below on the ground of mutual mistake. The theory of mutual mistake is based on the rule so often spoken of in the Law of Contracts as " the meeting of the minds."

" Assent, or a meeting of the minds of the parties to be bound, is essential to all consensual contracts. * * * It is essential that the minds of the parties should meet in respect to the nature and extent of the obligations assumed." (1 Clark New York Law of Contracts, § 8 and cases cited.)

" ' Assent in the sense of the law is a matter of overt acts, not of inward unanimity in motives, design or the interpretation of words.' (*Sokoloff* v. *National City Bank*, 239 N. Y. 158, 170.) When one signs a writing creating an obligation on his part, what he might have intended at the time of signing is immaterial, the overt act expresses his intent in a legal sense. (*Brown* v. *Champlin*, 66 N. Y. 214, 221.)" (*Matter of Triboro Coach Corp.* v. *State Labor Rel. Bd.*, 261 App. Div. 636, 638.) " * * * the recognition of the sanctity of contracts made between the parties would seem more likely to remove sources of industrial strife and unrest." (Same case, on affirmance, 286 N. Y. 314, 323.)

" It is true that acceptance of a document which plainly purports to be a contract gives rise to an implication of assent to its terms despite ignorance of the content thereof. (*Murray* v. *Cunard Steamship Co.*, 235 N. Y. 162; 1 Williston on The Law of Contracts [Rev. ed.] §§ 90A, 90B.) " (*Matter of Tanenbaum Textile Co.* v. *Schlanger*, 287 N. Y. 400, 403. See, also, *Booth* v. *Bierce*, 38 N. Y. 463, 466; *Pimpinello* v. *Swift & Co.*, 253 N. Y. 159, 164; *Scrantom* v. *Booth*, 29 Barb. 171, 173.)

" To make a valid contract, the minds of the parties must meet, and both must intend to enter into the engagement expressed by the terms of the contract." (*Cutts* v. *Guild*, 57 N. Y. 229, 234, citing *Dana* v. *Munro*, 38 Barb. 528; *Scrantom* v. *Booth*, 29 Barb. 171; *Booth* v. *Bierce*, 38 N. Y. 463.)

Particularly applicable to the question before us is the language of Judge HUBBS in *Farrington* v. *Harlem Savings Bank* (280 N. Y. 1, at p. 4) : " At the time of the alleged settlement, neither the claim agent nor the plaintiff knew of any injury except the superficial injuries referred to. No doubt the plaintiff had a perfect right to agree to settle for the injuries which were known and for all other injuries which might result, and such an agreement would be binding upon him no matter how serious the result of the injuries might thereafter turn out to be, *provided the agreement was fairly and knowingly made.*" (Italics ours.)

It cannot be said here that the parties to the release now under consideration " signed without any intention of the parties to release liability for injuries not known, * * * " (see *Barry* v. *Lewis*, 259 App. Div. 496) because at the time of the execution of the release by the plaintiffs to the defendant here, neither of the plaintiffs nor the defendant's agent had the thought of unknown injuries.

The question comes to mind as to whether the necessary assent or meeting of the minds applies to the apprehension of unknown injuries and their consideration, or whether the principle of the meeting of the minds applies to the terms of the release agreement. The response to that question is that the meeting of the minds is a meeting on what is under discussion as to the substance for which contract is made. Here, that substance was the settlement of the claims and here we have parties signing a release with full knowledge of its contents and import, and thus we have full proof of the meeting of the minds, the result of which meeting of minds in a release cannot be avoided by later knowledge of consequences unknown at the time of the execution of the release. The minds of the plaintiffs, and each one of them, met with that of the defendant, through its agent, on the objective of the plaintiffs, and each of them, giving up all thought of future claim against the defendant on account of the accident to the plaintiff wife, in return for which giving up the defendant paid very substantial moneys. This meeting of the minds of the plaintiffs, on one side, and that of the defendant, on the other side, was sufficient to make a contract of release " fairly and knowingly " and the release should not have been set aside and the separate defense should not have been stricken out below. (See *Mack* v. *Albee Press, Inc.*, 288 N. Y. 623.)

The separate defense of release pleaded, as established as the proof before the court below, is sufficient to be a bar against the actions brought by the plaintiffs-respondents. The judgment below as to the effect of such release should be reversed, the defense reinstated and the complaints dismissed on the ground that the release as established is a complete bar to the actions as brought.

All concur. Present — Crosby, P. J., Cunningham, Taylor, Dowling and Harris, JJ.

In each action: Judgment reversed on the law, with costs, and complaint dismissed, with costs.