GEORGE SHAPIRO, Plaintiff, *v.* QUEENS COUNTY JOCKEY CLUB, Defendant.

Municipal Court of the City of New York, Borough of Queens, January 29, 1945.

*Harry P. Keith* and *David J. Lewis* for plaintiff.

*Joseph Cavallaro* for defendant.

PETTE, J. Not without reason has horse racing been declared to be the " sport of kings." Oft quoted is the familiar statement: " It is a difference of opinion that makes horse racing." This might well apply to the factual situation presented in this case.

The subject of horses has long been a favorite one in the field of story books, as evidenced in the novels of Zane Grey, the famous novelist, in the production of numerous plays and motion pictures and in folk and popular songs. Every school child can recall the ever popular " De Camptown Races " by Stephen Foster, wherein the familiar words run: " I bet my money on the bob-tailed nag, Somebody bet on the bay."

The plaintiff herein instituted an action to recover the sum of $755, upon two causes of action: (a) upon an alleged contract made June 7, 1944, when he purchased two tickets at $50 each " to win " on a horse called " Breezing Home "; and (b) for money had and received, represented by the plaintiff's alleged share of the " win-pool ".

The answer interposed herein alleged: (a) a general denial; (b) a separate defense to the effect that the defendant operated the Aqueduct Race Track and conducted pari-mutuel betting thereon, pursuant to the Pari-mutuel Revenue Law of New York (L. 1940, ch. 254); (c) that the stewards who supervised the sixth race on the day in question, and the starter and his assistant decided that there had been a " false start " in said race and thereupon the sixth race was started properly with the con-

sent of the owner and/or trainer of the horse "Breezing Home"; and (d) that the said sixth race was won by a horse named "Bill Sickle" and that the plaintiff's selection "Breezing Home", did not participate in the "win-pool" on that day.

The testimony herein was duly taken at great length before the court. The plaintiff testified, in substance: that on June 7, 1944, he went to the Aqueduct Race Track; paid his admission to the grandstand; purchased an official program; purchased two $50 "win" tickets on "Breezing Home", horse No. 5 in the sixth race; there were six horses entered in this race and that he observed them as they entered the starting gate; that the starter George Cassidy gave the starting signal by pressing a button to open the stall gates; that the gates failed to open; only three of the horses, including "Breezing Home", left the starting gate; that two of these horses were stopped at various stages and that "Breezing Home" ran the full distance of the six furlongs and returned to the starting post. It was also adduced at the trial that: the starter had immediately signalled the assistant starter, posted with a flag about one sixteenth of a mile down the track, of a false start and to recall the horses; the assistant starter waved his recall flag and shouted to the riders to pull up; at the time of the signal, all of the horses were still in front of the assistant starter and in a position to see and hear the recall signal; and all of the horses, except "Breezing Home", were called up in obedience to the recall signal.

The testimony also established that the stewards confirmed the false start and called to the stewards' stand Matthew Brady, trainer of "Breezing Home" to inquire whether he desired to withdraw his horse from the race, in which event "Breezing Home" would have been scratched, and the money refunded to the holders of pari-mutuel tickets on said horse. Mr. Brady, however, stated that he wished the horse to race. The stewards thereupon, in order to afford a fair start for all horses, directed an interval of twenty-five minutes to elapse, during which time the jockeys and weights were dismounted from the horses, and a new starting gate was provided. Jockey Smith, who rode "Breezing Home", informed one of the stewards that he had seen the recall flag and heard the recall signal, but was unable to pull up his horse until it had run the six furlongs.

The horses went to the starting gate after the twenty-five-minute rest. At the signal a fair start was had and "Breezing Home" finished fifth in the field of six. "Bill Sickle" finished first. The order of the finish was declared and posted as the

official order of finish by the stewards. The official order of finish was flashed on the result board for the general public and also in the calculating room for the pari-mutuel system for the purpose of computing the "pay-off" on each horse.

At the plaintiff's request, the defendant conceded that at the false start of the sixth race, the starter pressed the starting button; that the "totalisator" machines (which are an integral part of the pari-mutuel system, pari-mutuel tickets being sold through said electrically operated vending machines, which print and count the tickets, and are installed and operated with the approval of the New York State Racing Commission; said machines also effect speedy and accurate computations of pools, sales of tickets; determine the odds payable to owners of winning tickets; and display all the necessary information to race-track patrons), were locked simultaneously and remained locked until they were unlocked and prepared for the seventh race. It was also conceded that the odds on "Breezing Home" were $6.55 to one and that if said horse had won the race, it would have paid off at those odds.

Before indicating the reasons for my opinion, I wish to commend David J. Lewis and Harry P. Keith, of counsel to the plaintiff, and Joseph B. Cavallaro, of counsel to the defendant, in their painstaking efforts both upon the trial and in the submission of briefs.

The questions of law and fact presented upon this lengthy trial are many in number and require careful consideration.

To begin with, there is the basic problem as to whether or not a valid contract was entered into by and between the plaintiff and the defendant, as alleged in the first cause of action of the complaint.

In the instant case the only obligation of the defendant to the plaintiff was to distribute the winning pool in the sixth race on June 7, 1944, to holders of tickets on "Bill Sickle", the officially declared winner of the race. The plaintiff did not possess tickets on said winning horse; as the holder of two "win" tickets on "Breezing Home", the plaintiff lost his right to participate in the "win-pool". It follows, therefore, that the plaintiff failed to establish a cause of action against the Queens County Jockey Club upon the alleged cause of action in contract. The fundamental elements of a contract between the plaintiff and the defendant were not established as a matter of law. (*Cutts* v. *Guild*, 57 N. Y. 229; *Kayser* v. *Arnold*, 124 N. Y. 674; *Consumers Ice Co.* v. *Webster, Son & Co.*, 79 App. Div. 350; *Trulock* v. *Kings County Iron Foundry, Inc.*, 216 App. Div. 439;

*Chiapparelli* v. *Baker, Kellogg & Co.*, 252 N. Y. 192; *Barber-Greene Co., Inc.*, v. *Dollard Jr., Inc.*, 239 App. Div. 655; *Moses* v. *Carver*, 164 Misc. 204, affd. 254 App. Div. 402; *Yehle* v. *New York Central R. R. Co.*, 267 App. Div. 301.) Under no interpretation of the plaintiff's evidence can this court imply " assent ", as defined in law of contracts in the State of New York, with reference to the facts in this case to the conduct of the defendant to pay or distribute the money in the " winning-pool " to any person other than the holder of the " win tickets " on the official winner of the sixth race, which was not " Breezing Home ". " Assent " in the sense of the law is a matter of overt acts, not of inward unanimity in motives, design or the interpretation of words. (*Matter of Triboro Coach Corp.* v. *State Labor Rel. Bd.*, 261 App. Div. 636, affd. 286 N. Y. 314, motion for reargument denied 287 N. Y. 647; see, also, *Yehle* v. *New York Central R. R. Co.*, 267 App. Div. 301.)

The Queens County Jockey Club is duly licensed by the State Racing Commission to conduct horse races under the rules and regulations of racing and to conduct the pari-mutuel system of wagering authorized by law.

The plaintiff contends that " Breezing Home " was the winner of the sixth race, which contention is predicated upon the theory that the false start in the sixth race was in fact an " official " race.

This contention is without merit. Admittedly, the plaintiff was familiar with the regulations and rules governing the conduct of horse racing, having attended the race tracks for approximately twenty years. His knowledge of such rules was further evidenced in the introduction of the official program (Plaintiff's Exhibit 1) from which he expressed familiarity. Horse races are supervised by various racing officials who make decisions in regard thereto by virtue of certain powers and duties prescribed by the New York State Racing Commission and the Jockey Club which are the legally constituted authorities which control racing in New York State. These rules and regulations control the manner of conducting races and the pari-mutuel system of wagering, which are binding upon the persons attending the horse races. Without such rules and regulations, the operation of race tracks would result in confusion and turmoil, resulting in irreparable damage and injury to both the public and owners. Prompt and fair decisions by the stewards, judges and track officials, of innumerable questions, which arise from time to time, are of the utmost importance to preserve the integrity of horse racing.

As in other professional competitive sports, such as tennis, baseball, football, basketball, hockey, boxing and soccer, it has been found of great practical importance to have umpires, referees, timekeepers and other officials in said sports, who are experienced, mentally alert, fair and otherwise well qualified to make immediate decisions, and whose decisions must be final and binding. In more than one sense, such officials are truly judges of the facts, since they are closer to the actual situation and characters involved, at the time, and as and when, and under the circumstances in which the events occurred. Surely their immediate reactions and decisions of the questions which arose during the conduct of the sport should receive greater credence and consideration than possibly the remote, subsequent, matter-of-fact observation by a court in litigation subsequently instigated by a disgruntled loser of a wager.

In the case of *Finlay* v. *Eastern Racing Association, Inc.* (308 Mass. 20, 24), Judge QUA, writing for the Supreme Judicial Court of the State of Massachusetts, said, in part: " It is common knowledge that at formal horse races there are persons in attendance who are charged with the duty of determining which horses are the winners under the terms and conditions under which a race is being conducted, much as at football or baseball games or other public contests persons are provided to act as referees or umpires. Purchasers of race tickets must be held to know this and to consent to be bound by the judgment of those regularly charged with the duty of decision."

Where there is no charge of bad faith against the stewards, judges, referees or other officials of the sport, it cannot ordinarily be the duty of the court at some remote time to substitute its decision for that of those persons who are actually there at the time and who were specifically charged with the duty of determining the winners. I find nothing in the statutes to suggest that the Legislature intended to impose upon the courts any duty of decision in such matters.

The General Rules of the State Racing Commission, printed in the official program (Plaintiff's Exhibit 1) and the Rules of Racing (Defendant's Exhibit 1), as well as the Pari-mutuel Revenue Law, furnish sufficient proof of the stringent control which is exercised by the governing bodies and officials, who are entrusted with the supervision of racing in the State of New York.

At this time it is well to observe that there are over two hundred rules of racing (as adopted by the Jockey Club, approved by State Racing Commission) alone, controlling all

phases of racing. For example, rule 43, provides "The Stewards have power, as they think proper, to make and, if necessary, to vary all arrangements for the conduct of the meeting, as well as power to put off any race from day to day until a Sunday intervenes." Rule 49 states "The Stewards have power to determine all questions arising in reference to racing at the meeting". Other rules provided for decisions promptly by the judges which "shall be final" unless objection is made to the winner and sustained, "subject to confirmation by the Stewards" (rule 55, subd. [a]). In these and similar rules of racing, there is sufficient evidence of the exclusive powers of the stewards over races.

The powers of the stewards have also been judicially confirmed in the recent case of *Merritt* v. *Swope* (43 N. Y. S. 2d 902, 905, affd. 267 App. Div. 519) wherein Supreme Court Justice WALTER, sitting in Special Term of New York County, said: "the fact remains that the State has undertaken to regulate both the business and the occupation, just as it has undertaken to regulate a host of other businesses and occupations, such as junkmen, plumbers, auctioneers, real estate brokers, employment agencies and others. It is plain, too, that while the regulatory body consists in part of men who become part thereof by virtue of election or appointment to a position in a private corporation, rather than by election or appointment to any public office, that regulatory body derives its power to license jockeys from an act of the State Legislature, i.e., from the State itself, and in exercising such power that body and the individuals composing it are exercising a State function just as much as if each such individual had become a part of the regulatory body by appointment by the Governor or a Mayor or election by the people. Equally plain is it that the regulation is designed, not in the interest or for the benefit of the Jockey Club as a private corporation, but in the interest and for the benefit of the public."

The court indicated that the effect of the statute was to make the Jockey Club the agent or instrumentality of the State for the purpose of carrying out those regulatory powers and functions as were specified therein.

The testimony upon the trial clearly establishes the fact that the decisions and acts of the stewards and starter were in accordance with the statute and rules of racing; that they had the power to make these decisions is amply substantiated. There is no proof that "Breezing Home" would have won if the false start had been a fair start. The plaintiff's contention for the

award to him of the winner's share of the "pool" is pure speculation based upon the hypothetical and unfounded conclusion that "Breezing Home" would have won if all the other horses had run in the race. False starts in horse racing, as in other similar sports, are not uncommon. When the officials declared a false start in the sixth race, the plaintiff was bound by said decision. There was only one official race. The defendant was justified in distributing the pari-mutuel pool based upon the official decision of the stewards at the track.

The pari-mutuel system of betting has been explained in the recent case of *Aliano* v. *Westchester Racing Assn.* (265 App. Div. 225, 228–229) wherein the Appellate Division, Second Department, in an opinion written by then Associate Justice CLOSE, now the Presiding Justice thereof, in which it was stated: "Pari-mutuel betting differs from the personal transaction between a bookmaker and a bettor, in which the agreement to pay winnings is made on the personal responsibility of the bookmaker. Under the pari-mutuel system every bettor contributing to the mutuel pool becomes in effect a bookmaker for every other bettor and the pool so constituted is responsible for payment of winnings. The racing association is the administrative agent for the collection and distribution of the pool and presentation to it of a ticket for payment from the sum deposited in the pool is essential to the proper conduct of that system of betting."

The Queens County Jockey Club was merely the stakeholder of the bets, and as such, acted merely as an administrative agent in the collection and distribution of the "winning pool." It consequently cannot be held liable to the plaintiff herein upon the alleged cause of action of money had and received. It would be inequitable to allow the plaintiff to recover upon the theory presented to this court since it would result in an unjust enrichment at the expense of the defendant and other patrons who placed their bets on "Breezing Home" and who accepted the decision of the stewards and judges of the race as final.

The plaintiff has not shown that he is entitled to recover and, therefore, the complaint must be dismissed upon the merits.