**Tomas ROBLES, Plaintiff,**

v.

**TRINIDAD CORPORATION, Defendant.**

**No. 62 Civ. 1803.**

United States District Court
S. D. New York.

Nov. 22, 1966.

Bernard Rolnick, New York City, for plaintiff; Richard D. Huttner, Harry A. Ezratty, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendant; John B. Shields, New York City, of counsel.

LEVET, District Judge.

This is a Jones Act suit for personal injuries suffered by plaintiff, a merchant seaman, on May 29, 1960, aboard the defendant's vessel, the SS Lyon's Creek. Trial was to the court.

On or about June 15, 1960, a previous action for the injuries was instituted in this court, Tomas Robles v. Trinidad Corporation, 60 Civ. 2350. However, on or about September 13, 1960, the plaintiff signed and delivered a release and received the sum of $3,650, which release purported to end all claims arising from the injuries received on said date.

The present action proceeds upon plaintiff's contention that the aforesaid release was invalid. Plaintiff submitted certain proof as to alleged invalidity, and in connection therewith was allowed to submit proof as to damages since the two were to some extent intertwined. Ultimately, after the commencement of the trial, this court concluded to first determine the question of the validity of the release upon the basis of the proof submitted by plaintiff and upon certain proof as to this feature submitted by defendant. The question of damages was reserved until if and when the court determined that the release was invalid. Consequently, this opinion deals solely with the question of the validity of the release.

Plaintiff's counsel stipulated that there was no claim that any deception, coercion or overreaching was practiced and that the sole contention was that plaintiff was unaware that he was suffering from a mental illness at the time he executed the release.

The complaint asserts in effect that the parties, plaintiff and defendant, were advised that plaintiff's injuries were slight and temporary in character and that there was a mutual mistake of fact. (Par. 7) In the pre-trial order it was stated in part that plaintiff contends that "neither plaintiff nor defendant intended to release any claim for the existing mental illness nor was either party aware of such illness."

After hearing the testimony of the parties, examining the exhibits, the peadings, the briefs and Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. On May 29, 1960, the plaintiff, while a member of the crew of the SS Lyon's Creek, employed by defendant as a messman, in the course of his work entered the ship's freezer, and because

the latch on the inside of the freezer was out of order was unable to let himself out; and since the alarm system, normally activated from inside the freezer, was also out of order, plaintiff was unable to signal his predicament or to leave the freezer, where he remained for about one hour in a temperature of approximately 15° Fahrenheit, clad in a tee-shirt and cotton pants. By reason of the aforesaid conditions the SS Lyon's Creek was unseaworthy.

2. After this incident plaintiff was taken to the United States Public Health Service Hospital at New Orleans, Louisiana. The provisional diagnosis was frostbite of the right thumb and acute anxiety reaction. Plaintiff complained of tenseness, nervousness, headache, aching in the right hand, chest pain, insomnia, fever and chills. He was placed on phenobarbital and nocturnal sedation; by June 1, 1960 his only complaint was of nervousness. On the same day he was discharged, not fit for duty for one week.

3. From June 13, 1960 to June 29, 1960, plaintiff was an in-patient at the United States Public Health Service Hospital at Staten Island, New York. The diagnosis there was "psychoneurotic reaction with somatic symptoms." A psychiatric examination revealed that plaintiff was tense, somewhat frightened but alert and correctly oriented, although mildly depressed, and "verbalizing" feelings of not wanting to return to sea again. Plaintiff stated that the uppermost thought in his mind when locked in the freezer was, "I would die." He was generally anxious but not suicidal; his behavior was said to be unremarkable. During his stay at the hospital at Staten Island he complained intermittently of pain in all his joints and of anxiety and was given Meprobamate which did not relieve his tension. The record also stated: "It was our feeling that while litigation is pending, treatment of this man would be difficult." On June 22, 1960, plaintiff was given building privileges, apparently indicating a freedom of movement through the hospital building. Plaintiff requested to return to Puerto Rico, where his wife and family resided. On June 29, 1960 he was discharged, not fit for duty, with a letter recommending treatment at the Public Health Hospital in San Juan, Puerto Rico. The diagnosis at Staten Island was "post traumatic neurosis, psychoneurosis with somatic symptoms." (Ex. 3)

4. On or about or before June 6, 1960, plaintiff retained one Clara Fischer, an attorney, to bring a claim against the defendant, and such an action was instituted on or about June 15, 1960. In said action in this court (60 Civ. 2350) the complaint, among other things, charged that by reason of the refrigerator or freezer incident on the said vessel the plaintiff became sick and disabled, requiring his hospitalization and requiring him to leave his employment on board the vessel; that he received treatment in the hospital and "will never in the future be able to work in the same manner as heretofore and plaintiff's earning power will be greatly diminished * * *," asking damages on the first cause of action in the sum of $75,000.00.

Mrs. Fischer is an experienced member of the bar of the State of New York, having been admitted in 1951 or 1952, and having specialized in personal injury and seamen's cases. Mrs. Fischer testified that since 1960 she handled approximately 600 seamen's cases per year, most of which were settled. Counsel conceded that Mrs. Fischer was not charged with incompetency. Between June 6, 1960 and September 13, 1960, Mrs. Fischer received certain medical and hospital records or portions thereof, including the following:

(a) A medical report of duty status from the United States Public Health Service Hospital, Staten Island, New York, dated August 15, 1960, indicating "not fit for duty"; a medical report of duty status from the United States Public Health Service Hospital, New Orleans, Louisiana, dated May 30, 1960, indicating exposure to cold,

frostbite and acute anxiety reaction; a medical report from the United States Public Health Service Hospital, Staten Island, dated June 3, 1960, "not fit for duty"; a similar report from the Staten Island hospital, dated July 19, 1960; another report of like character from the same hospital, dated August 4, 1960; a report from the same hospital, dated June 24, 1960, indicating "not fit for duty," with a diagnosis of "post-traumatic psychoneurotic reaction with somatization." (Ex. 15)

(b) Copy of letter dated June 29, 1960, from the Deputy Chief, United States Public Health Service, Psychiatry Service, Staten Island, to the medical officer in charge of the Public Health Service Outpatient Clinic, San Juan, Puerto Rico, in reference to the plaintiff, advising that there was a diagnosis at Staten Island of "post traumatic neurosis" and that plaintiff's complaints were "joint pains and depressive and fearful feelings."

An Abstract from the Clinical Record of plaintiff, revealing complaints of severe nervousness and pain and admission to the hospital at Staten Island on June 13, 1960 for symptoms of "tension, nose-bleeds, and joint pains" with a diagnosis of "post traumatic neurosis and psychoneurosis with somatic symptoms." (Ex. 16)

I find that the medical records clearly evidenced and diagnosed plaintiff's neurotic condition.

(c) Extracts from the Staten Island Hospital Record, page 2, which notes under "Doctor's Progress Notes" in reference to plaintiff's hospitalizations: " * * * whose 'real' or 'neurotic' illness has necessarily been confused by the apparent spectre of litigation" and that the physical examination reveals nothing objective, the impression stated being "probably primarily psychoneurosis." (Ex. 17)

(5) Plaintiff's attorney was fully aware of plaintiff's medical problems, as appears in Finding No. 4 herein, and, as appears in Finding No. 7 herein, in discussing settlement with the defendant's representative, Mr. Wardle of the Shipowner's Claims Bureau Inc., she was fully cognizant of plaintiff's psychoneurotic illness.

6. On September 13, 1960, plaintiff executed a release (Ex. 5) and received the sum of $3,650 (less $478 for maintenance previously paid). This release specified that it included "every right or claim which I now have, or may hereafter have on account of injuries or illness suffered by me as follows: injuries alleged to have been sustained by me and/or illness alleged to have been incurred and/or contracted by me on or about May 30, 1960 and/or at any other time or times." It also included a statement: " * * * it being my intention by the signing of this paper to wipe the slate clean as between myself and the parties released, even as respects injuries, illnesses, rights and claims not mentioned herein or not known to me."

The plaintiff was asked to read certain statements which followed and these statements indicated that the plaintiff was releasing present or "in the future such injuries, illnesses and disabilities, and even though they are not mentioned particularly in this release * * *." It also stated that "my injuries and illnesses and disabilities may have been, may be, or may turn out to be worse than they seem to be now." Plaintiff was asked to indicate in his own handwriting if he had read the six numbered statements and he answered "Yes." He answered "Yes" to indicate that he had read the paper from beginning to end; he answered "Yes" to the question, "Has this paper been read to you?" He wrote "Yes" in answer to the question, "Do you know what this paper is which you are signing?" Plaintiff signed his name to the release and three witnesses, including Clara Fischer, the attorney, certified that the paper was executed in their presence and that the plaintiff acknowledged that he fully understood its contents, etc. The acknowledgement of plaintiff's signature was taken by Mrs. Fischer, the

attorney. Mrs. Fischer testified that she signed the release as a witness and as a notary public; that she was present when plaintiff signed the release; that she read it to him and explained it to him; that the plaintiff filled out the answers to the questions above referred to; that she explained to plaintiff that once he signed this release it was the end of his claim against the company and that he should deliberate before doing so, and that plaintiff directed her to settle the case.

Plaintiff was able to read English; he knew that Exhibit 5 was a release and when he signed it he knew that it would be the end of the case. He read the release before he signed it.

I am of the opinion that plaintiff knew the meaning of "psychiatric treatment" (testimony of plaintiff, Dr. Monserrate and Clara Fischer) and that he was suffering from an anxiety reaction, neurotic in character.

7. The attorney, Clara Fischer, saw plaintiff about 15 times between June 6, 1960 and September 13, 1960, discussing his claim or suit about 10 times and discussing his claimed injuries. Mrs. Fischer knew that plaintiff had an anxiety reaction and that she had a highly nervous client as a result of the fright, and she and plaintiff discussed in general all his symptoms and complaints. She discussed the case with Mr. D. Wardle of the Shipowners Claims Bureau, speaking to him on July 11 and July 28, 1960, discussing plaintiff's injury or illnesses, *"mostly his mental complaints,"* and that he was complaining of pains in the chest. Mrs. Fischer discussed settlement with Mr. Wardle about 10 times; she told him of the nature of plaintiff's injuries, including all the symptoms and complaints.

I find that at all times during the negotiations for settlement both plaintiff's counsel, Clara Fischer, and D. Wardle, defendant's representative, knew the general nature of plaintiff's illness and that he was subject to "anxiety reactions" and "psychoneurosis."

8. Fernando M. Monserrate, a licensed psychiatrist now practicing in Puerto Rico, testified as to examination which he made of plaintiff. The first examination was on January 12, 1961; later he examined plaintiff again on October 27, 1966, just before his testimony was given.

Dr. Monserrate testified that in his *opinion* plaintiff, on September 13, 1960, when he signed the release, was unaware that he was suffering from a psychiatric or emotional condition, · but the Doctor stated that he expressed no opinion as to whether plaintiff knew the character of the paper he signed. However, this opinion was not based upon a complete examination of the records with respect to the plaintiff since the Doctor did not read all of these records. Moreover, no report or record showed plaintiff's condition as of September 13, 1960. Dr. Monserrate did not examine him until later.

In view of the other testimony in this case, including that of the plaintiff and of the attorney, Clara Fischer, in respect to the background and in respect to the execution of the release, and in view of the inadequacy of Dr. Monserrate's factual hypothesis, I do not believe that Dr. Monserrate's opinion is correct. Moreover, this is not the type of fact which to my mind is readily susceptible to opinion testimony.

9. Following execution of the release on September 13, 1960, plaintiff returned to work at sea. On October 13, 1960 he joined the crew of the SS Atlantic; on December 9, 1960, the SS Santa Rosa; and on December 30, 1960, the SS Santa Paula. On each occasion prior to signing on he was subjected to the usual pre-sign on physical examination and found fit for duty.

10. There is no evidence that the plaintiff at any time had any mental difficulties other than psychoneurosis. In fact, counsel for plaintiff stipulated that no mention of "psychosis" appears in the record. Dr. Monserrate conceded that the diagnosis of psychiatric neurotic reaction is not psychosis and that he did

not diagnose plaintiff's condition as psychotic; that if plaintiff had been psychotic, it would be obvious to a psychiatric physician and that there was no evidence that plaintiff was a paranoid at the time he signed the release.

I find no evidence of psychosis.

11. After plaintiff signed the said release on September 13, 1960 and after having served as a seaman aboard the steamships above mentioned, he was treated at various Public Health Service Hospitals, as follows:

(a) Public Health Hospital, San Juan, Puerto Rico, January 9, 1961 to January 23, 1961; diagnosis, "severe psychoneurotic disorder, anxiety and phobic reactions." (Ex. 7)

(b) United States Public Health Service Hospital, Staten Island, admitted January 26, 1961 and discharged February 15, 1961. At this time the psychiatric examination stated:

"Patient was a well developed, well nourished Puerto Rican male who was alert, oriented and cooperative. His demeanor is meek, passive and mournful. He does not appear [sic] more than mildly anxious or depressed despite his attesting to marked anxiety. He described a multitude of emotional symptoms including insomnia, irritability, multiple phobias and nightmares. He shows marked preoccupation with these symptoms and speaks of little else. He is generally logical, relevant coherent. No psychotic phenomena were elicited. No organic mentation was noted. The patient was not suicidal or assaultive."

In a portion of the paragraph entitled, "Course in the Hospital," page 3 of the record, it is stated:

" * * * The patient continued to claim a multitude of emotional discomforts and somatic pains yet manifested none in his appearance or behavior.

"It was felt that the legal involvement of the case was chiefly responsible for the patient's complaints and that he was consciously and intentionally magnifying or inventing symptoms for purposes of successful litigation. It was difficult to conceive of a patient, not otherwise psychotic experiencing such emotional torment as he lists and to reveal none of it to the staff or his attending physician in his behavior."

"Final Diagnosis: Malingerer." (Ex. 9)

(c) United States Public Health Service Hospital, Staten Island, March 9, 1961 to March 15, 1961. Diagnosis: "Gross Stress Reaction." (Ex. 8)

(d) United States Public Health Service Hospital, Staten Island, September 22, 1961 to September 29, 1961. "The patient currently reports a difficult marital situation. He is married to a Puerto Rican divorcee * * *." Diagnosis: "Anxiety Reaction." (Ex. 10)

12. I find that there was no mistake here concerning the illness suffered by plaintiff; there was no mistake as to the existence of a psychosis and, at best, a miscalculation of consequences.

13. There was no overreaching, no fraud, no misrepresentation, no mutual mistake of any kind, or other inequitable conduct of any kind on the part of defendant.

DISCUSSION

There is no doubt that "one who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman". Harmon v. United States, 59 F.2d 372, 373 (5th Cir. 1932); Law v. United Fruit Company, 264 F.2d 498, 499 (2nd Cir.), cert. denied 360 U.S. 932, 79 S.Ct. 1452, 3 L.Ed.2d 1546 (1959); McBrien v. United States Petroleum Carriers, Inc., 177 F.Supp. 627 (S.D.N.Y.1959).

A mistake as to the future unknowable effect of existing facts, a mistake as to the future uncertain duration of a known condition, or a mistake as to the future effect of a personal injury is insufficient to set aside a release. Chi-

cago & N. W. Ry. Co. v. Wilcox, 116 F. 913, 914 (8th Cir. 1902); Farmers Mutual Automobile Ins. Co. v. Buss, 188 F. Supp. 895 (D.Kansas 1960), appeal dismissed by agreement, 291 F.2d 752 (10th Cir. 1961); Rice v. Trunkline Gas Co., 323 F.2d 394, 396 (7th Cir. 1963). The same rule prevails in the New York Courts. Turner v. Mutual Benefit Health & Acc. Ass'n, 5 Misc.2d 524, 531, 160 N.Y.S.2d 883 (Special Term, Oneida County 1957), aff'd mem. 5 A.D.2d 951, 172 N.Y.S.2d 571 (4th Dept. 1958); Harvey v. Georgia, 148 Misc. 633, 266 N.Y.S. 168 (Sup.Ct., Tompkins Co. 1933); Moyer v. Scholz, 22 A.D.2d 50, 253 N.Y.S.2d 483 (3rd Dept. 1964).

In Moyer v. Scholz, supra, a so-called "whiplash" injury was involved. The doctor's initial examination disclosed no objective physical finding which might suggest the presence of any serious traumatic neck pathology. Later, apparently after the release, the doctor noted certain neurological involvements. In denying rescission, Hamm, J. (3rd Dept.) wrote:

" 'There is a difference between a "failure to appreciate the consequences" of an injury which is regarded as "the sequellae of a known injury"; and a "mistake of fact as to the existence of an injury". In the former circumstances "the release may not be set aside" (Gallo v. Montenigro, 17 A.D.2d 935, 234 N.Y.S.2d 490).' (Perry v. Kingston City Transp. Corp., 19 A.D.2d 202, 203, 241 N.Y.S.2d 579, 580, per Bergan, P. J.) It is clear from the plaintiff's testimony and from her physician's affidavit that the plaintiff was aware of a neck injury and mistook the future consequence or effect of the injury." (22 A.D.2d pp. 51–52, 253 N.Y.S.2d p. 484)

The state courts have also decided that a mere miscalculation as to the consequences of an injury does not amount to mutual mistake and would be no basis for rescission. Bellomo v. Lincoln Sav. Bank, Bklyn., 23 Misc.2d 632, 201 N.Y.S. 2d 24 (Sp. Term Kings Co. 1960); Joell v. Borough Rug & Carpet Cleaning Co., 31 Misc.2d 1035, 221 N.Y.S.2d 999 (Sp.

Term Queens Co. 1961); Mack v. Albee Press, Inc., 263 App.Div. 275, 277 and cases cited on page 277, 32 N.Y.S.2d 231 (1st Dept. 1942), aff'd, 288 N.Y. 623, 42 N.E.2d 617, motion for reargument denied, 288 N.Y. 734, 43 N.E.2d 354 (1942); Yehle v. New York Central R. Co., 267 App.Div. 301, 312, 46 N.Y.S.2d 5 (4th Dept. 1943), aff'd, 295 N.Y. 874, 67 N.E. 2d 516 (1946).

To justify avoidance of a release, a mistaken belief as to the probable developments from and permanency of a known injury is not sufficient. Farmers Mutual Automobile Ins. Co. v. Buss, 188 F.Supp. 895, 897 (D.Kansas 1960), appeal dismissed by agreement, 291 F.2d 752 (10th Cir. 1961).

■ Here, the plaintiff was not overreached, the release was fairly made and fully comprehended. Robles had a full understanding of his rights. He was not under any economic stress. He was represented by his own attorney. He knew the nature and meaning of the terms of the release. Each party entered into the settlement based on identical information. There is no taint of fraud. Such a release must be sustained. Sitchon v. American Export Lines Inc., 113 F.2d 830 (2nd Cir.), cert. denied, 311 U.S. 705, 61 S.Ct. 171, 85 L.Ed. 458 (1940); McBrien v. United States Petroleum Carriers, Inc., supra; Miles v. New York Central R. Co., 195 App.Div. 748, 178 N.Y.S. 637 (3rd Dept. 1921), appeal dismissed, 233 N.Y. 644, 135 N.E. 953 (1922).

In Sitchon v. American Export Lines, supra at 833, which involved substantially the same form of release, Augustus N. Hand, Circuit Judge, wrote:

" * * * if there was a mistake as to the nature or extent of the injuries, and the judge in the court below seems to have thought there was none, the release accompanying the settlement fairly arrived at was a bar to the plaintiff's action. Bonici v. Standard Oil Co., 2 Cir., 103 F.2d 437; Harmon v. United States, 5 Cir., 59 F.2d 372;

Spangler v. Kartzmark, 121 N.J.Eq. 64, 187 A. 770; Cogswell v. [Boston & M.] Railroad, 78 N.H. 379, 101 A. 145."

 A mistake by one party to a release, unless accompanied by fraud or misrepresentation or other inequitable conduct by the other party, is insufficient to avoid a release. Mistake must be mutual. Hutcheson v. Frito-Lay, Inc., 315 F.2d 818 (8th Cir. 1963).

 Certain testimony of Mrs. Fischer to which plaintiff's counsel objected as privileged between attorney and client was taken subject to a motion to strike. (See Fischer testimony, p. 19 et seq.) This testimony related to discussions with plaintiff as to his claims and the settlement of the case. Since the attorney was authorized to press the claim, plaintiff thus consented to her advocating settlement during which his injuries were presented to the claim adjuster. It is evident that the communications received from the records given to the lawyer were not confidential in any respect. They were utilized by her to press the claim of plaintiff. Hence, what plaintiff told Mrs. Fischer about injuries was not confidential. No intention of confidentiality ever existed.

I, therefore, refuse to strike the testimony of Mrs. Fischer. See VIII, Wigmore, Evidence, § 2311 at 599, 600 (McNaughton Rev. 1961); Willard C. Beach Air Brush Co. v. General Motors Corp., 118 F.Supp. 242 (D.N.J.1953), aff'd, 214 F.2d 664 (3rd Cir. 1954); Flaherty v. Wunsch, 28 N.Y.S.2d 178 (Sup.Ct.Monroe Co. 1941).

### CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and the subject matter hereof by reason of Title 46 U.S.C. § 688.

2. The release (Ex. 5) was fairly made and fully comprehended by plaintiff; there was no mistake concerning plaintiff's injuries; the plaintiff was aware of his neurotic condition; he was represented by counsel, whose competence was not at issue.

3. There was no deception, coercion or overreaching or other inequitable conduct by defendant.

4. In no event was there any mutual mistake; at most, there may have been a miscalculation of the consequences.

5. The release executed by plaintiff is valid and binding upon him.

6. The defendant is entitled to judgment dismissing the complaint with costs.

Settle judgment upon notice and pursuant to the foregoing.