GRISBAUM, Judge.
Appellant, James A. Ray (Ray), filed suit against Defelice Marine Contractors, Inc. individually and as a division of Gulf Fleet Marine Operations, Inc. (Defelice) for $2,100,000 in damages for a maritime injury resulting in the amputation of his left leg and disability of his right leg. Defelice denied liability and pleaded the action was barred by a $115,000 settlement executed by Ray. Trial was limited to the validity of the release. This appeal is from the trial court’s finding the release to be valid.
The issue is whether Ray had a full understanding of his rights when he executed the release. We reverse.
On September 29, 1978, Ray, while employed by Defelice as a seaman, was transferring from a barge to a boat when he was crushed between the vessels and received severe injuries to both of his legs. Ray was treated at Defelice’s expense by physicians of his choice and was paid $100 per week maintenance. Defelice also provided Ray with $3300 to purchase a car. Following his discharge from the hospital, Ray lived with friends in Houma, Louisiana but in December of 1978, Ray moved to Florida to stay with his mother. Dr. Samuel Steiner of Homestead, Florida assumed responsibility as the treating orthopedist and hospitalized Ray in February of 1979 for corrective surgery. During this hospitalization, Dr. *1103 Steiner called in a psychiatrist to see Ray because of behavioral difficulties. He was seen by Dr. Bernard Savariego who recommended Ray undergo limited psychotherapy. On May 7, 1979, Dr. Steiner wrote to Defelice’s house counsel, Mr. Joseph McCusker, advising Ray had achieved maximum cure but also stated Ray might require additional surgery. After being discharged as able to return to work, Ray contacted Joseph McCusker and met with him to discuss a settlement. Ray was ultimately offered $115,000 and the promise of a job with Defelice. After accepting these terms, Ray signed a release at the settlement conference.
Within eight months of the settlement, Ray spent most of the settlement money. He remained in Florida taking odd jobs until January of 1981 when he returned to work for Defelice. In November of 1981, due to an infection on the stump of his left leg, Ray required a revised amputation above the knee. Several months later, he quit his job with Defelice and returned to Florida to work.
In addressing the question of whether Ray had a full understanding of his rights Ray asserts the testimony of several psychiatrists shows Ray did not emotionally understand the consequences of his injury. Dr. Savariego, the only psychiatrist who saw Ray prior to the settlement, stated “psychiatric evaluation did not show evidence of psychosis or depression” but stated plaintiff was “mildly grandiose as he described his present situation and future plans.” He explained the term “mildly grandiose” has “no diagnostic significance within it. It’s a descriptive term meaning that Ray had an exaggerated view of himself under the circumstances.” Counsel for Ray and for Defeliee executed a joint stipulation that because Dr. Savariego did not see Ray at the time of the settlement he had no opinion as to whether Ray was or was not in a position to enter into a final settlement for his injuries on May 17, 1979. Dr. Marilyn Skinner, a psychiatrist, was called in by Ray’s second treating orthopedist, Dr. Manale, because Dr. Manale perceived Ray to be having difficulty dealing with his injury. Dr. Skinner saw Ray approximately eight times, commencing November 1981, which was two and one-half years after the settlement. She testified Ray “was depressed” and when asked what was Ray’s psychological state at the time that she first saw him she stated:
[I]t is not abnormal for a person to deny the loss of his leg and say, “You know, I don’t think this is so bad.” For the first day, and then, of course, it kind of settles in and then they begin to experience a depression which is a normal depression and they work through that depression just as one has a normal period of mourning from the loss of a wife or a husband which society and medicine which would think was strange if a person didn’t have a normal period of mourning for a loss and they would consider that a very serious sign that something was suspiciously very wrong, but after a period of time, that loss is appropriately mourned and accepted and worked through — whether a psychological loss of a partner or the physical loss of a leg and/or the emotional loss attached to the physical loss, if that isn’t worked through at some time, then it is not a normal depression — a normal grief reaction — it becomes a clinical depressive illness, per se — a pathological phenomenon.
When asked as to Ray’s ability to understand on the date that he executed the release she stated:
My opinion is that as far as being able to read it, it is rather complicated legal reading for a poor physician but, I think, he is quite capable of understanding intellectually what he is reading — quote, unquote — and I think he is capable of everday acts — signing checks; going to the grocery store; reading; writing; talking to people; saying “yes” or “no” and even capable of making a contract. However, I do not think that he was capable of appreciating the consequences of what he was doing... .
In further elaborating she stated:
[I]t is inconceivable to me that he could have entered into a contract that would *1104 have actually taken into account the genuine ramifications which he himself did not take into account in any meaningful emotional way.
In further testifying she stated:
Obviously some one who is suffering from some real injury who at some various level of defensive denial denies the injury, is not in full appreciation of reality as you and I see it and, I think, that, of course, any time that you are excluding some sense of reality even if it is only in a symbolic way you limit your judgment, you limit your data.
Finally, Dr. Skinner frankly stated, “I would certainly say anything I have said about the patient prior to my seeing him should be taken with as many as grains of salt as you may wish to take it with” and that she was speculating as to Ray’s emotional state at the time of the settlement. Dr. Herman Colomb, a psychiatrist, saw Ray once at the request of Defelice’s counsel. His opinion was Ray was an immature, impulsive individual who intellectually knew the probable consequences of his acts. Dr. Colomb further stated, “I don’t think any nineteen year old, especially an immature nineteen year old, can emotionally appreciate such a thing.” He finally stated he did not think Ray was depressed and his destructive behavior had been going on since his teens. Defelice argues there is a difference between a failure to appreciate the consequences of an injury and a mistake of fact as to the existence of an injury. In the former circumstances, the release may not be set aside. Robles v. Trinidad Corporation, 270 F.Supp. 570 (S.D.N.Y.1966). They further argue Ray knew the nature and meaning of the terms of the release at the time of its execution as evidenced by the fact Ray testified he understood the terms and understood once he signed and received the money it was “the end of the ballgame” insofar as any accident or injury which occurred during the course of his employment with Defelice. Also, all of the psychiatrists agreed Ray intellectually understood the terms of the release.
The applicable legal principles which guide this court were described in 1823 by Justice Story, stating:
[Seamen] are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees .... If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.. . . And on every occasion the court expects to be satisifed, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen. Harden v. Gordon, 11 Fed.Cas. at pages 480, 485, No. 6,047.
Over one hundred years later the Supreme Court in Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed.2d 239 (1942), a seaman’s release case, reaffirmed the validity of the above pronouncements and established the standards by which such bargains were to be judged:
The analogy suggested by Justice Story . .. between seamen’s contracts and those of fiduciaries and beneficiaries remains, under the prevailing rule treating seamen as wards of admiralty, a close one. Whether the transaction under consideration is a contract, sale, or gift between guardian and ward or between trustee and cestui, the burden of proving its validity is on the fiduciary. He must affirmatively show that no advantage has been taken; and his burden is particularly heavy where there has been inadequacy of consideration.
The wardship theory has, as was recognized by the courts below, marked consequence on the treatment given seamen’s *1105 releases. Such releases are subject to careful scrutiny.... We hold, therefore, that the burden is upon one who sets up a seaman’s release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with a full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding.... (Footnotes omitted.)
Recognizing the obligation to carefully scrutinize this seaman’s release and the special relationship a seaman holds as a ward of the court, this court’s interpretation of determining whether Ray had a full understanding of his rights includes not only an intellectual understanding but also an emotional understanding. This case involves a nineteen year old seaman who, from the reports of Dr. Savariego, Dr. Skinner, and Dr. Colomb, was an immature, impulsive and at least grief-stricken young man. Even though Dr. Skinner saw Ray some two and one-half years after the signing of the release, this court was impressed with her “qualified opinion” that it was inconceivable to her that Ray could have entered into a contract taking into account the genuine ramifications of his act in any meaningful emotional way. It was also her opinion Ray had “limited judgment.” This court has also taken into account that in spite of Ray’s mother, father, and friends recommending he obtain his own legal counsel, the fact remains prior to and including the time of the execution of the release, he did not have his own legal counsel. Coupled with these factors is the realization Ray released his rights for a very serious injury which, pending proof of liability and numerous other factors, could be valued at a sum several times more than the settlement.
This case does not present a situation of a medical miscalculation of the consequences of an injury but, rather, an emotional inability to understand the consequences of an injury. This court does not find a failure to disclose any known material medical facts nor fraud, deception, or coercion. However, when considering the totality of the circumstances, this court finds at the time of the execution of the release, Ray did not have a full understanding of his rights. Therefore, the release ought to be set aside as inequitable.
For the reasons assigned, we reverse the judgment of the trial court and assess all costs of this appeal to appellee.
REVERSED.